
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MYLA NAUMAN, JANE ROLLER, and MICHAEL LOUGHERY, | )<br>)<br>) |
| Plaintiffs, | )<br>)<br>) No. 04 C 7199 |
| v. | )<br>) Judge Robert W. Gettleman |
| ABBOTT LABORATORIES, and HOSPIRA, INC., | )<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Myla Nauman, Jane Roller and Michael Loughery have brought a three count putative class action complaint against defendants Abbott Laboratories and Hospira, Inc., alleging violations of § 510 of ERISA, 29 U.S.C. § 1140. Count I is brought against Abbott, plaintiffs' former employer, alleging that Abbott terminated plaintiffs' employment, by selling the division for which they worked, with the specific intent to interfere with plaintiffs attainment or receipt of benefits under the various Abbott benefit plans. Count II, also brought against Abbott, alleges that Abbott then adopted a no-hire policy under which it refused to rehire plaintiffs for a period of two years, effectively eliminating any rights plaintiffs could have retained under the Abbott plans. Count III is directed against Hospira, a new company, spun off from Abbott's division for which plaintiffs worked. Count III alleges that Hospira, by agreement with Abbott, adopted a no-hire policy under which it refused to hire any employee who chose to first retire and collect retirement benefits from Abbott prior to seeking employment from

Hospira. Both Abbott and Hospira have moved to dismiss for various grounds. For the reasons set forth below, the motions are denied.

## FACTS

Plaintiffs' complaint centers around Abbott's spin-off of its Hospital Products Division ("HPD") to form a new company, Hospira, Inc. Plaintiffs, who were all sales representatives for HPD, allege that Abbott created Hospira as a "dumping ground for its aging Hospital Product Division workforce." According to the complaint, Abbott had a reputation as offering one of the best employee benefits packages in corporate America. It promoted that reputation to hire and retain employees. Abbott's inducements were particularly effective in retaining HPD employees. By 2003, HPD was Abbott's "most senior division," with 70% of its employees age 40 or older. Thus, by 2003 Abbott faced significant liabilities in connection with benefits already earned by employees.

To avert the looming enormous benefit costs that it would incur if the HPD employees succeeded in retiring from the company and becoming eligible for promised retirement benefits, Abbott decided to spin-off HPD into a purportedly "separate and independent" company named Hospira, Inc. According to plaintiffs, this had the effect of terminating en masse all of the HPD employees. Hospira's officers all came from Abbott. For example Chris Begley, President of HPD, became CEO of Hospira. Abbott's treasurer was expected to become Hospira's chief financial officer and Abbott's vice-president of domestic legal operations would become Hospira's general counsel. Other key HPD employees were to take similar roles with Hospira. Abbott and Hospira then ensured that the HPD employees would not receive the benefits they would have otherwise received if their employment at Abbott had not been terminated by

2

adopting no-hire policies. Under those policies, the spun-off former HPD employees were precluded from returning to Abbott for a period of two years, and those employees who did return experienced a break in service under the Abbott plans that reduced the employment benefits they could earn after their return. In addition, Hospira adopted a two year no-hire policy that prevented HPD employees from retiring from Abbott and receiving retirement benefits, while continuing to work for Hospira. All this was done, according to plaintiffs, to prevent the HPD employees from attaining expected benefits under the various Abbott benefit plans.

## DISCUSSION

Abbott has raised a variety of challenges to the two counts brought against it. First, Abbott argues that plaintiffs have failed to exhaust administrative remedies. Next, Abbott argues that Count I fails to state a claim under § 510 because plaintiffs were not "discharged" from Abbott and, even if they were, the complaint fails to alleged that the spin-off interfered with their benefits. Finally, Abbott argues that plaintiffs do not have standing to challenge the Abbott no-rehire policy as alleged in Count II and, in any event, the refusal to rehire is not actionable under § 510. Hospira raises similar challenges to Count III. The court rejects each of these arguments.

### 1. Count I

Plaintiffs admit that they have not pursued any administrative remedies arguably available under any of the applicable plans. The complaint alleges that exhaustion would be futile because the plans do not provide a procedure or remedy for reviewing the type of claims asserted, and that none of the plans grant any entity the authority to review claims based on the ERISA violations asserted.

3

Abbott contends that each of the plans contains a one-or two-step appeals procedure to challenge decisions regarding benefits. For example the Retiree Medical Plan contains the following provision:

> If your claim is denied and you disagree with this finding, you must first file an appeal with the Claims Administrator within 180 days1 after the date your receive a written claim denial. If your appeal to the Claims Administrator is denied, you may file a second level appeal [to the Plan Administrator] . . .. All appeals must be in writing and must be filed within 60 days after the date you receive the written appeal denial from the Claims Administrator . . .. The decision of the Plan Administrator is final and binding on all individuals dealing with or claiming benefits under the plan and, if challenged in court the plan intends for the Plan Administrator's decision to be upheld, unless found by a court of competent jurisdiction to be arbitrary and capricious.

Under ERISA, exhaustion of remedies is not an element of a plaintiff's claim for damages, but rather an affirmative defense, addressed to the sound (but circumscribed) discretion of the court. Moore v. ABB Power T&D Co., Inc., 2000 WL 1902185 (S.D. Ind. 2000) (citing Gallegos v. Mt. Sinai Medical Center, 210 F.3d 803, 808 (7th Cir. 2000)). It is true, as Abbott argues, that in the instant case plaintiffs' complaint includes allegations with respect to exhaustion, thereby raising the issue of whether plaintiffs have pleaded themselves out of court. See Moore, 2000 WL 190, 218 at *2. But even if plaintiffs have accepted the burden of pleading exhaustion, the court concludes they have met that burden.

The administrative review procedures of the plans in questions are not as clear as Abbott would suggest. The same plans and procedures were reviewed by Judge Marovich in Szymanska v. Abbott Laboratories, 1994 WL 118154 (N.D. Ill. 1994), in connection with an assertion on summary judgment that a plaintiff's claim of discrimination under § 510 was subject to exhaustion. Judge Marovich reviewed the plan language, noting that the plans had a clear

4

procedure for challenging the denial of benefits, but no such similar language "that would indicate to an employee a method to pursue claims of discrimination due to past use of benefits or interference with the future use of benefits. In fact, one passage advises the employee that if she is discriminated against she may file suit in federal or state court." Id. at *14. Based on Judge Marovich's assessment of the plan language, this court concludes that plaintiff have adequately alleged that exhaustion would be futile.[1]

Next, Abbott challenges the sufficiency of Count I, arguing that it fails to state a claim because plaintiffs were not "discharged" from Abbott. Section 510 (29 U.S.C. § 1140) makes it:

> unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary for exercising any right [under the plan] or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter or the Welfare and Pensions Plan Disclosure Act.

To state a claim under § 510, "plaintiffs must establish more than a loss of benefits; they must demonstrate that their employers terminated them with the specific intent of preventing or retaliating for the use of benefits." Lindemann v. Mobile Oil Corp., 141 F.3d 290, 295 (7th Cir. 1998). Abbott argues that none of the plaintiffs were terminated in the spin-off because they maintained the exact same positions with Hospira that they had with Abbott. According to Abbott, the only thing that changed was the ownership of the company as a result of a stock-

---

[1] Abbott argues that accepting Szymanska holding effectively eliminates the exhaustion requirement because every plan informs the participant of the right to file suit. Abbott misreads Judge Marovich's opinion in Szymanska. It was not simply that the plans contained language regarding the right to file suit that led to the decision, but the fact that the plan delineates a clear procedure for administrative review of the denial of benefits, but is not as clear for claims of discrimination for interference with future use of benefits. That lack of clarity, coupled with the language regarding filing suit, is what led to Judge Marovich's decision in Szymanska and this court's decision in the instant case.

transfer, which involves "no break or hiatus between two legal entities, but is, rather, the continuing existence of a legal entity, albeit under new ownership." Esmark, Inc. v. NLRB, 887 F.2d 739, 751 (7th Cir. 1989). Of course, what defendant ignores is that at least one other thing has changed as a result of the change of ownership: plaintiffs are no longer employed by Abbott, and thus are no longer participants in the Abbott plans, a change which plaintiffs allege was effected for the specific purpose of denying them benefits.

Nonetheless, Abbott argues that the stock-transfer, and the resulting termination of plaintiffs' employment with Abbott does not constitute a "discharge" for purposes of § 510. Abbott relies predominately on Andes v. Ford Motor Co., 70 F.3d 1332 (D.C. Cir. 1995), which it describes as holding that the sale of a subsidiary to a third party does not amount to a "discharge" of the subsidiary's employees under § 510. In actuality, the Andes decision was not quite so broad.

In Andes, Ford sold one of its subsidiaries to a third party which offered a less attractive benefits plan. The plaintiffs argued that Ford had "discharged" them for the purpose of interfering with their right to accumulate benefits under the Ford plans. After reviewing the language of the statute, the court concluded that Congress used the word "discharge" to refer to a personalized decision, as opposed to any employment termination including a permanent layoff caused by impersonal factors. This means "an employer's decision to sell or close down an operation would not normally implicate § 510 merely because the action caused the termination of employees. If Congress had wished for § 510 to apply routinely to such decisions, which are virtually always based, at least in part, on labor costs, it would surely have included the terms 'layoff' and 'termination.'" Id. at 1337-38 (emphasis added).

Of course, stating that a decision to sell does not "normally" implicate § 510, and that § 510 does not "routinely" apply to such decisions is a far cry from holding, as defendants argue, that § 510 can never apply to the sale of a subsidiary or unit. Indeed the use of such conditional terms as "normally" and "routinely" implies that given the right set of facts, § 510 could apply to such a sale. And if there was any further doubt on the extent of its holding on this issue, the Andes court clarified:

> This is not to say that § 510 can never be implicated in a company's basic organizational decision. If, for example, a plaintiff produced evidence that a particular company determined that 20 of its employees were soon to become eligible for a rich benefits package and noted that 19 of those employees were conveniently located in one subdivision with perhaps only a few other employees - a company shut down of that operation might only be an indirect method of discharging those high benefit employees. In such a situation, the organization's decision merely masks a determination to interfere with the employees' attainment of benefit plan rights. Accordingly, we think that as applied to sale or closure of an entire unit, the plaintiffs can satisfy § 510 only by showing that some ERISA-related characteristics special to the unit (such as its having a clearly above-average proportion of employees with pension rights about to vest) is essential to the firm's selecting the unit for closure or sale."

This is precisely what plaintiffs have alleged in the instant case: that HPD was the most senior division with 70% of its employees age 40 or older. The complaint specifically alleges that Abbott decided to spin-off HPD to prevent the abnormally high number of employees from becoming eligible for retirement benefits by terminating them en masse. In essence plaintiffs allege that the spin-off was just an indirect method of discharging the HPD high benefit employees. Thus, under the Andes decision, plaintiffs have stated a claim under § 510.

Moreover, there are significant differences between the instant case and Andes, not the least of which is that the Andes court granted summary judgment to Ford because the plaintiff

had no evidence that the sale was unlawfully motivated.[2] Id. at 336. Additionally, in the instant case, plaintiffs allege that Abbott and Hospira adopted a no-hire policy specifically to divest plaintiffs from "bridging rights"[3] that they would otherwise have had. Accordingly, the court concludes that plaintiffs have alleged sufficiently that they were discharged within the meaning of § 510.

Finally, with respect to Count I, Abbott also argues that even if plaintiffs were discharged, they have not alleged that the spin-off interfered with their benefits. Abbott argues that it was not the "discharge" that changed plaintiff's benefits, but Hospira's decision to amend its plans after the spin-off, and employers are generally free to amend plans at any time. See Vallone v. CNA Financial Corp., 375 F.3d 623, 632 (7th Cir. 2004). Plaintiffs allege, however, that while Abbott and Hospira told the HPD employees that their benefits would remain the same, in actuality both defendants had already agreed that Hospira would alter those benefits. Abbott could not effect an amendment to its plans that was directly solely at the HPD employees, nor could it simply terminate the HPD employees to avoid their accruing benefits. Therefore, it concocted the spin-off to eliminate HPD employees from the Abbott plans, with the intent that Hospira, a new entity, could alter its own plans. Abbott and Hospira cannot do jointly what

---

[2] Blaw Knox Retirement Income Plan v. White Consolidated Industries, Inc., 998 F.2d 1185 (3rd Cir. 1993), is likewise of no help to Abbott. In Blaw Knox, the plans brought suit against the corporate employer alleging that the employer's sale of a group of unprofitable subsidiaries and their assorted under-funded pensions plans violated § 510. The district court dismissed for failure to state a claim and the appellate court affirmed because the sale and transfer of the plans "did not affect the participant's eligibility for benefits under the plans." Id. at 1191.

[3] Plaintiffs define "bridging rights" as rights "that entitle them to accrue plan benefits after termination that, if they return to Abbott's employ within a certain period of time, may be added to the benefits they had accrued before termination."

Abbott could not do on its own. See Lassard v. Applied Risk Management, 307 F.3d 1020, 1024-35 (9th Cir. 2002). Accordingly, Count I states a claim and Abbott's motion to dismiss Count I is denied.

### 2. Counts II and III

In Counts II and III plaintiffs allege that Abbott and Hospira violated § 510 by adopting the no-hire policies. Both Abbott and Hospira argue that plaintiffs lack standing to bring this claim because they have not alleged that they were affected by the policy, specifically because they have not alleged that they have applied for and were denied employment.

Plaintiffs do not challenge the policies as a refusal to hire per se, however, but rather as part of the scheme to terminate HPD employees en masse to ensure a loss of benefits. The harm alleged is thus a loss of bridging rights, thereby capping any accrual of benefits. The policy preventing rehire, and thus preventing bridging, affects every employee subject to the spin-off. Thus, plaintiffs have standing to assert their claims.

Hospira and Abbott also challenge the sufficiency of the Counts II and III, arguing that a refusal to rehire claim is not actionable under § 510 which, as noted, prevents only interference with the attainment of benefits as a result of a decision to "discharge, fine, suspend, expel, discipline or discriminate against a participant." 29 U.S.C. § 1140. Obviously, the statute makes no mention of the words "hire" or "rehire." This omission has led several courts to conclude, as defendants argue, that hiring or rehiring decisions are not actionable under § 510.

In particular, defendants rely on Becker v. Mack Trucks, Inc., 281 F.3d 372 (3rd Cir. 2002), in which the defendant closed a facility, resulting in a number of employees losing jobs. Some transferred or were absorbed into other plants. Others, like the plaintiffs in Becker, either

9

accepted a cash "dislocation benefit" to relinquish their seniority rights or were laid off and eventually exhausted their recall rights. Those plaintiffs with vested rights alleged that the defendant violated § 510 when it refused to rehire them to avoid increased pension liability. It was undisputed that the defendant actually acted with the specific purpose of preventing pension benefit increases to previously terminated employees. The court rejected the plaintiffs' position that the claim was covered under § 510 because they were "discriminated against," stating (id. at 381):

> ERISA is designed to protect benefits promised to an employee arising from a pre-existing employment relationship. Though the vested plaintiffs once had an employer-employee relationship with Mack, the complaint does not address a deprivation of any pre-existing ERISA or recall rights arising out of their former employment. Instead, plaintiffs seek protection as job applicants. Such protection is inconsistent with Congress's purpose in enacting ERISA.

Numerous other courts have also held that § 510 does not apply to decisions to hire or rehire based on the wording of the statute. See e.g., Williams v. American Int'l Group, Inc., 2002 WL 31115184, *2 (S.D. N.Y. 2002) (Section 510 protects against the disruption of employment privileges, not the decision to rehire by the terms of the hiring); Schwartz v. Independent Blue Cross, 299 F.Supp.2d 441, 444-45 (E.D. Pa. 2003).

Plaintiffs' allegations, however, are that the no-rehire policies were not separately adopted, but rather were created and adopted as part of the overall scheme to terminate plaintiffs from their employment with Abbott to prevent accrual of benefits under the Abbott plans. Thus, the court agrees with plaintiffs that the instant case is more similar to Eichorn v. AT&T Corp., 248 F.3d 131 (3rd Cir. 2002), in which a restrictive covenant prevented employees of a divested subsidiary from returning to the parent corporation group until after their pension bridging rights

had lapsed. The alleged purpose of the restrictive covenant was to prevent experienced employees from leaving the subsidiary when it was purchased by a third party. The third party elected not to offer a defined pension benefit program resulting in the restrictive covenant having the effect of separating the employees from the parent company in a manner that eliminated their accrual of benefits. The Third Circuit concluded that the plaintiff's had stated a claim under § 510 against the parent company and reversed the grant of summary judgment. Id. at 149.

In the instant case, because plaintiffs allege that the no-hire policies were an integral part of the overall scheme to eliminate plaintiff's benefits, Counts II and III state claims under § 510. Accordingly, both Abbott's and Hospira's motions to dismiss Counts II and III are denied.

## CONCLUSION

For the reasons set forth above both Abbott's and Hospira's motion to dismiss are denied in their entirety. This matter is set for a report on status May 12, 2005, at 9:00 a.m. The parties are directed to meet and confer prior to that date to prepare a discovery plan and a plan with respect to the issue of class certification. A written summary of such plans shall be filed on or before May 9, 2005. The partial stay of discovery entered on February 7, 2005, is hereby vacated.

**ENTER:** **April 27, 2005**

**Robert W. Gettleman**
**United States District Judge**