**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MYLA NAUMAN, JANE ROLLER and MICHAEL LOUGHERY, | ) ) ) | |
| Plaintiffs, | ) ) | No. 04 C 7199 |
| v. | ) ) | Hon. Robert W. Gettleman |
| ABBOTT LABORATORIES and HOSPIRA, | ) ) ) | Magistrate Geraldine Soat Brown |
| Defendants. | ) | |

**ABBOTT LABORATORIES' REPLY MEMORANDUM IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ..........................................................................................1

ARGUMENT ................................................................................................3

I.    Abbott Is Entitled To Summary Judgment On Count I (The Spin Decision).........................3

    A.    Plaintiffs Have Failed To Satisfy The *Andes* Standard....................................3

        1.    The *Andes* Standard Applies In The Seventh Circuit .............................3

        2.    Plaintiffs Have Failed To Identify Any Evidence Suggesting Core HPD Possessed Any "Special," "Clearly Above Average" ERISA Characteristic .........4

        3.    Plaintiffs Failed To Identify *Any* "Specific Fact" Suggesting The Decision Makers Knew About, Much Less Found "Essential," The "Differences" They Rely Upon ........6

    B.    Plaintiff's Case Also Fails Under A *McDonnell-Douglas* Analysis............................8

        1.    Plaintiffs Cannot Proceed Under the Direct Method Of Proof .............................8

        2.    Plaintiffs Have Failed To Establish A *Prima facie* Case ........................................9

            a.    Benefits "Savings" Viewed In The Abstract Are Insufficient To Establish A *Prima facie* Case .........9

            b.    Concern About An Industry-Wide Rise In Benefits Costs Does Not Establish A *Prima Facie* Case .........10

            c.    Discussions About How To Address Benefits When *Implementing* The Spin Fail To Establish A *Prima facie* Case .........12

            d.    Abbott's Broad Strategic Review Refutes, Rather Than Supports, Plaintiffs' Efforts To Establish A *Prima facie* Case .........13

        2.    Plaintiffs Cannot Show Abbott's Explanation For The Spin Is A Lie .................14

II.    Abbott Is Entitled To Summary Judgment On Count II (No Hire Claim)............................16

    A.    Plaintiffs Make No Effort To Establish That The Legitimate Basis For The No-Hire Policy Is Pretext .........16

    B.    Plaintiffs' No-Hire Claim Is Moot Because The No-Hire Policy Expired .................17

        C.      The No-Hire Claim Cannot Stand As An Independent Claim....................................19

III.    Abbott Is Entitled To Summary Judgment On Count IV (Fiduciary Breach Claim) ............19

        A.      Regardless Of Its Alleged Fiduciary Duty Concerning The Transitional Plan,
                Abbott Had No Possible Duty With Respect To Hospira's 2005 Benefits Plan .........19

        B.      Plaintiffs Fail Completely To Show Any Harm From Not Having More Than
                Six-Months Notice Of The Details Of Hospira's 2005 Benefits Plan........................23

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adams v. Ford Motor Co.*,
   847 F. Supp. 1365 (E.D. Mich. 1994)..................................................................24

*Adams v. Lockheed Martin Energy Systems*,
   2006 WL 2430047 (6th Cir. Aug. 21, 2006)................................................ 20-22

*Adams v. Wal-Mart Stores, Inc.*,
   324 F.3d 935 (7th Cir. 2003) .................................................................... 8, 21-22

*Alexander v. Bosch Automotive Systems, Inc.*,
   2007 WL 1424299 (6th Cir. May 14, 2007) .......................................................18

*Ames v. American Nat'l Can Co.*,
   1997 WL 733893 (N.D. Ill. 1997), *aff'd*, 170 F.3d 751 (7th Cir. 1999) ........... 20-22

*Andes v. Ford Motor Co.*,
   70 F.3d 1332 (D.C. Cir. 1995)..............................................................Passim

*Aronson v. Servus Rubber, Div. of Chromalloy*,
   730 F.2d 12 (1st Cir. 1984)............................................................................3

*Baggett v. Woodbury*,
   1987 WL 383796 (N.D. Fla. Jan. 16, 1987) ....................................................24

*Bass v. Conoco*,
   676 F. Supp. 735 (E.D. La. 1988)....................................................................3

*Beach v. Commonwealth Edison Co.*,
   382 F.3d 656 (7th Cir. 2004) ................................................................ 20-22

*Beatty v. North Central Companies, Inc.*,
   170 F. Supp. 2d 868 (D. Minn. 2001).............................................................24

*Bilow v. Much Shelist Freed Denenberg Ament & Rubenstien, P.C.*,
   277 F.3d 882 (7th Cir. 2001) .......................................................................11

*Blaw Knox Ret. Income Plan v. White Consol. Indus., Inc.*,
   998 F.2d 1185 (3d Cir. 1993)..........................................................................3

*Bock v. Computer Associates Int'l Inc.*,
   257 F.3d 700 (7th Cir. 2001) .......................................................................23

*Bronk v. Mountain States Telephone and Telegraph, Inc.*,
   140 F.3d 1335 (10th Cir. 1998) ....................................................................19

*Cerutti v. BASF Corp.*,
349 F.3d 1055 (7th Cir. 2003) .................................................................. 8-9

*Clark v. Chrysler Corp.*,
673 F.2d 921 (7th Cir. 1982) ..................................................................... 19

*Coleman v. General Elec. Co.*,
643 F.Supp. 1229 (E.D. Tenn. 1986) ......................................................... 21

*Coomer v. Bethesda Hospital, Inc.*,
370 F.3d 499 (6th Cir. 2004) ..................................................................... 19

*Croslan v. Hous. Auth. for the City of New Britain*,
974 F. Supp. 161 (D. Conn. 1997) ............................................................. 23

*Curtiss-Wright Corp. v. Schoonejongen*,
514 U.S. 73 (1995) ..................................................................................... 19

*Daugherty v. Honeywell, Inc.*,
3 F.3d 1488 (11th Cir. 1993) ....................................................................... 3

*Deeming v. American Standard, Inc.*,
905 F.2d 1124 (7th Cir. 1990) ..................................................................... 4

*Deich-Keibler v. Bank One*,
2007 WL 1827260 (7th Cir. June 26, 2007) ............................... 1, 3, 6, 16

*Eckelkamp v. Beste*,
201 F. Supp. 2d 1012 (E.D. Mo. 2002) ..................................................... 24

*Eichorn v. AT&T Corp.*,
484 F.3d 644 (3d Cir. 2007) ................................................................. 17-18

*Fischer v. Philadelphia Electric Co.*,
96 F.3d 1533 (3d Cir. 1996) ..................................................................... 21

*Forrester v. Rauland-Borg Corporation*,
453 F.3d 416 (7th Cir. 2006) ............................................................... 1, 14

*Gavalik v. Continental Can Co.*,
812 F.2d 834 (3d Cir. 1987) ....................................................................... 4

*Hensley v. P.H. Glatfelter Co.*,
2005 WL 3158033 (W.D.N.C. Nov. 28, 2005) .......................................... 25

*Howe v. Varity Corp.*,
36 F.3d 746 (8th Cir. 1994) ......................................................... 21-22, 24

*Humphries v. CBOCS West, Inc.*,
    474 F.3d 387 (7th Cir. 2007) ...............................................................................14

*Isbell v. Allstate Ins. Co.*,
    418 F.3d 788 (7th Cir. 2005) ..........................................................................9, 13

*Jakimas v. Hoffman-La Roche*,
    485 F.3d 770 (3d Cir. 2007)...................................................................... 5, 9-10

*Jordan v. City of Gary, Ind.*,
    396 F.3d 825 (7th Cir. 2005) ...........................................................................8-9

*Kampmier v. Emeritus Corp.*,
    472 F.3d 930 (7th Cir. 2007) ..........................................................................9, 11

*La Fata v. Raytheon Co.*,
    302 F. Supp. 2d 398 (E.D. Pa. 2004) ..................................................................3

*McGann v. Auto-Body North Shore, Inc.*,
    7 F.3d 665 (7th Cir. 1993) ................................................................................19

*Millsap v. McDonnell Douglas Corp.*,
    368 F.3d 1246 (10th Cir. 2004) .........................................................................18

*Murray v. Chicago Transit Authority*,
    252 F.3d 880 (7th Cir. 2001) .............................................................................15

*Nelson v. Potter*,
    2007 WL 1052490 (N.D. Ill. April 2, 2007)......................................................15

*Panzino v. Scott Paper Co.*,
    685 F. Supp. 458 (D.N.J. 1988) ........................................................................23

*Pickering v. USX Corp.*,
    809 F. Supp. 1501 (D. Utah 1992).......................................................................4

*Plummer v. Consol. City of Indianapolis, Marion Co., In.*,
    2004 WL 2278740 (S.D. Ind. Aug. 17, 2004) ...................................................21

*Regel v. K-Mart Corp.*,
    190 F.3d 876 (8th Cir. 1999) .............................................................................11

*Shields v. Local 705*,
    188 F.3d 895 (7th Cir. 1999) .............................................................................24

*Tomanovich v. City of Indianapolis*,
    457 F.3d 656 (7th Cir. 2006) .............................................................................11

*Unida v. Levi Strauss & Co.*,
   986 F.2d 970 (5th Cir. 1993) .......................................................................................3, 11

*United States v. Raymond*,
   228 F.3d 804 (7th Cir. 2000) ..............................................................................................6

*Varhola v. Doe*,
   820 F.2d 809 (6th Cir. 1987) ..............................................................................................3

*West v. Greyhound Corp.*,
   813 F.2d 951 (9th Cir. 1987) ..............................................................................................3

*Wyninger v. New Venture Gear, Inc.*,
   361 F.3d 965 (7th Cir. 2004) ............................................................................................11

## **INTRODUCTION**

Nothing in Plaintiffs' brief disguises the fundamental deficiencies in their case. They admit virtually all of Abbott's proposed material facts. Most critically, they admit HPD had "*essentially the same*" demographics as the other spin candidates. (Pl. Resp. SOMF ¶ 40). That single admission destroys Count I. Under *Andes*, § 510 applies to corporate reorganizations only when (a) the affected business unit had a "special" ERISA characteristic (b) that was "essential" to the challenged decision. Admitting HPD had "essentially the same" demographics is the opposite of showing it had "special" demographics.

To attempt to avoid the consequences of their admission, Plaintiff argue that the *Andes* standard does not apply in this circuit. But they relied on that standard to avoid a Rule 12(b)(6) dismissal. And just weeks ago, after noting it had not yet addressed "whether the sale of a division may constitute a violation of § 510," the Seventh Circuit applied the *Andes* standard to affirm a summary judgment ruling. *Deich-Keibler v. Bank One,* 2007 WL 1827260 (7th Cir. June 26, 2007).

In a glancing effort to meet the *Andes* standard despite their decisive admission, Plaintiffs also rely on minor demographic differences estimated by a third party in January 2004 – four months *after* the spin was publicly announced. Even if those purported differences were accurate (they are not), Plaintiffs fail to allege that the decision makers (Abbott's Board, CEO, and CFO) were even aware of the differences, much less that they found them "essential" to their *earlier* spin decision.

Plaintiffs attempt to rely on the traditional *McDonnell-Douglas* framework in a further effort to avoid *Andes*. But even if that framework were applicable, Plaintiffs have established neither a *prima facie* case nor pretext. For pretext, Plaintiffs offer absolutely nothing suggesting Abbott's proffered justification for the spin is a "lie" or a "phony excuse." *Forrester v. Rauland-Borg Corporation*, 453 F.3d 416, 419 (7th Cir. 2006).

This is not a case about a manager's undocumented explanation for one employee's termination. To explain why its CEO, CFO, and Board of Directors created a 10,000-employee, $6 billion company, Abbott has provided dozens of exhibits totaling hundreds of pages spanning more than a year. All of these documents – including board minutes, CEO-prepared presentations, and Morgan Stanley financial reports – uniformly explain the "compelling

strategic rationale" for the spin. And all of Abbott's witnesses, including the most senior officers at the company, confirmed that rationale under oath.

Plaintiffs nevertheless proclaim that Abbott's heavily-documented, uniform explanation is "not credible." (Pl. Mem. at 20-22.) Feigned incredulity does not avoid summary judgment. Abbott's explanation was "credible" to Morgan Stanley, which concluded the HPD spin would impact Abbott's financial future more favorably than any other strategic option under consideration – a conclusion Plaintiffs admit had nothing to do with benefits. (Pl. Resp. to SOMF ¶¶ 21, 26, 27) And Abbott's explanation was "credible" to its Board of Directors, which concluded the HPD spin would enhance shareholder value – a conclusion Plaintiffs admit was based on a CEO presentation that never mentioned benefits. (Pl. Resp. to SOMF ¶¶ 33, 52)

What is not credible, in contrast, is Plaintiffs' theory that – at enormous expense – Abbott transferred about *$800 million* in assets and spun off a 10,000-employee division responsible for *$2.4 billion* in annual sales simply to avoid annual benefits costs of *$67 million* (plus a one-time $78 million paper gain). In support of that economically illogical theory, Plaintiffs rely on the fact that benefits were discussed "when implementing the HPD spin." (Pl. Mem. at 1.) But discussing benefits when *implementing* a spin – particularly one involving 10,000 employees – is both unavoidable and irrelevant. The question is whether avoiding benefits costs *motivated* the spin decision in the first place. Plaintiff cite no evidence on that question.

Plaintiffs' no-hire claim (Count II) is equally flawed. They make no effort to show that the core rationale for the no-hire policy was pretext. And Plaintiffs also cannot avoid the reality that the claim is moot. The policy expired over a year ago in May 2006. They argue there's still something at stake because they are seeking a relevant equitable remedy, *i.e.*, "mandatory reinstatement" for any HPD employee who wants an available job. But that proposed remedy is not available under the law and, thus, cannot resurrect the now-moot claim.

Plaintiffs' fiduciary breach claim (Count IV) fares no better. Plaintiffs ignore that any alleged "harm" is completely refuted by the fact that their purported "lost opportunities" (*i.e.*, retiring early, seeking alternative employment, and/or protesting the benefits changes) were fully available when Hospira announced the benefits changes in June 2004. Those opportunities remained available for another six months until the changes became effective in January 2005. Additionally, Plaintiffs fail to assert Abbott had a fiduciary duty with respect to Hospira's 2005 benefit plans, which are the only plans Abbott allegedly made a misrepresentation about.

## ARGUMENT

**I.     Abbott Is Entitled To Summary Judgment On Count I (The Spin Decision).**

Plaintiffs have failed to raise a genuine issue of fact for Count I under either the *Andes* standard or the traditional *McDonnell-Douglas* burden-shifting analysis.

### A.     Plaintiffs Have Failed To Satisfy The *Andes* Standard

#### 1.     The *Andes* Standard Applies In The Seventh Circuit.

Contrary to Plaintiffs' contention, the Seventh Circuit has now confirmed the *Andes* standard applies in this circuit. *Deich-Keibler v. Bank One,* 2007 WL 1827260 (7th Cir. June 26, 2007). In *Deich-Keibler*, after noting that it has never held that corporate reorganizations implicated § 510, the Seventh Circuit acknowledged that the D.C. Circuit in *Andes* "held that a party may establish a violation of § 510 under such circumstances, but 'only by showing that some ERISA-related characteristic special to the unit ... was essential to the firm's selecting the unit for closure or sale.'" *Id.* at *4 (citing *Andes v. Ford Motor Co.*, 70 F.3d 1332, 1338 (D.C. Cir. 1995)). The Court then affirmed summary judgment in a case involving the sale of a Bank One division, explaining that the plaintiffs had offered no "evidence of *specific facts* to raise a genuine issue of fact as to whether Bank One intended to discriminate against this particular division because of some characteristic of the benefit plan." *Id.* (emphasis added).

The Seventh Circuit's decision follows a long line of cases – including the many cases cited below from seven different circuits – easily granting or affirming summary judgment against claims that a corporate reorganization violated § 510.[1] This is consistent with the fact that the statute was not designed to apply to "corporate organizational changes, such as a decision to sell a subsidiary." *Blaw Knox Ret. Income Plan v. White Consol. Indus., Inc.,* 998 F.2d 1185, 1191 (3d Cir. 1993).

---

[1]     *See, e.g., Andes v. Ford Motor Co.,* 70 F.3d 1332, 1337 (D.C. Cir. 1995) (affirming summary judgment relating to sale of subsidiary); *Daugherty v. Honeywell, Inc.*, 3 F.3d 1488 (11th Cir. 1993) (same with respect to close of division); *Unida v. Levi Strauss & Co.*, 986 F.2d 970 (5th Cir. 1993) (same with respect to plant closing); *Varhola v. Doe*, 820 F.2d 809 (6th Cir. 1987) (same with respect to sale of plant); *West v. Greyhound Corp.*, 813 F.2d 951 (9th Cir. 1987) (same with respect to sale of plant); *Aronson v. Servus Rubber, Div. of Chromalloy*, 730 F.2d 12 (1st Cir. 1984) (same with respect to sale of plant); *La Fata v. Raytheon Co.*, 302 F. Supp. 2d 398, 418-419 (E.D. Pa. 2004) (same with respect to the sale of a company); *Bass v. Conoco,* 676 F. Supp. 735 (E.D. La. 1988) (same with respect to sale of plant).

In an effort to suggest otherwise, Plaintiffs cite three cases they claim found § 510 violations based on corporate reorganizations. They are mischaracterizing the cases. For instance, the Seventh Circuit in *Deeming v. American Standard, Inc.,* 905 F.2d 1124 (7th Cir. 1990), specifically held that the disputed plant closing did not violate § 510: "The appellees *cannot credibly claim* that the Indianapolis plant was closed because American Standard wanted to save pension costs." *Id.* at 1127 (emphasis added). Rather, the Court found a violation based on the defendant's violation of an existing policy by altering the affected employees' "status" to "terminated" (which eliminated certain pension rights) rather than "laid off" (which would have preserved those same rights). *Id.* at 1128.[2]

In the end, there is no question that proving a corporate reorganization violates § 510 requires extraordinary circumstances. The example offered in *Andes*– 19 of 20 employees (95%) on the verge of vesting in a rich benefits package – makes that point abundantly clear.

### 2. Plaintiffs Have Failed To Identify Any Evidence Suggesting Core HPD Possessed Any "Special," "Clearly Above Average" ERISA Characteristic.

In an effort to meet first prong of the *Andes* standard, Plaintiffs contend that 41% of HPD employees (not core HPD) were within 5 years of being retirement eligible and that 18% were already eligible. (Pl Mem. at 17). Even if that were true, however, it is irrelevant under *Andes*, which requires a showing of a "characteristic *special* to the unit," meaning a characteristic that is "clearly above average" when *compared* to another relevant population. *Andes,* 70 F.3d at 1337-38. Plaintiffs have not offered any evidence that their 41% and 18% figures were any different from the rest of the company, and they likely were not because HPD had the same average age as other major Abbott divisions. (*See* SOMF ¶ 40; Ex. 84 at Ex. A).

Far from showing it had "special" ERISA characteristics, Plaintiffs "admit" that HPD had "*essentially the same*" demographics as the other two spin candidates. (Pl. Resp. SOMF ¶ 40 (emphasis added)). That single admission kills Count I. And contrary to Plaintiffs' rank speculation, the three spin candidates – representing nearly 60% of all Abbott employees – were not the "oldest" divisions. They had the same demographics as the rest of the company:

---

[2]     *See also Gavalik v. Continental Can Co.,* 812 F.2d 834, 857 (3d Cir. 1987) (finding § 510 violation based on closure of production line only because the company had a "liability avoidance" program that shifted business to plants with low unfunded pension liabilities); *Pickering v. USX Corp.,* 809 F. Supp. 1501, 1545-52 (D. Utah 1992) (finding § 510 violation where company announced plant would remain open but then reversed course after reviewing large pension liabilities associated with the plant).

|  | *Average Age* | *Average Service* | *% Over 40* |
|---|---|---|---|
| *HPD* | 42.05 | 9.77 | 61.64 |
| ■ | 41.82 | 9.7 | 61.29 |
| ■ | 41.98 | 10.49 | 61.45 |
| *ABBOTT*[3] | 41.14 | 9.086 | 57.07 |

(Ex. 84 at ¶ 3 and Ex. A).

Instead of contesting this data's accuracy – which is taken directly from Abbott's employee database (*Id.*, ¶¶ 3-8) – Plaintiffs contend that Abbott is relying on "a brand-new statistical analysis." (Pl. Mem. at 17). That is not true. Abbott disclosed this data over 18 months ago when opposing class certification. (Abbott Opp'n To Class Cert. at Exhibit A). Plaintiffs thus had every opportunity to conduct discovery to challenge the data's accuracy. Instead of doing so, Plaintiffs rely on rough estimates generated by Hewitt in January 2004, which suggested that HPD has a slightly higher average age (1.9 years), average service (2.6 years), and percentage over 40 (10% higher) compared to the rest of Abbott. (Pl Mem. at 23).

Plaintiffs cite these bare Hewitt numbers without any analysis of their significance. The whole point of *Andes* – which Plaintiffs ignore – is that the identified ERISA characteristic must be sufficiently "special" to make it sensible to focus on that characteristic when making the challenged decision. That would require, of course, some analysis showing the difference could possibly have motivated the decision, which in this case was a costly spin that produced a 10,000 employee, $6 billion company. *See, e.g., Jakimas v. Hoffman-La Roche,* 485 F.3d 770, 786-87 (3d Cir. 2007) (rejecting argument that $22 million in pension savings established a *prima facie* case where plaintiffs "failed to consider any costs" incurred by decision).

Plaintiffs conduct no such analysis. Rather, they simply declare that "by selecting HPD, [Abbott] could achieve a great benefit savings." Pl. Mem. at 18. But, under *Andes*, Plaintiffs must show the benefit savings would be significantly "greater" than some other comparative Abbott population, not just "great" in the abstract.

Moreover, the fact that Hewitt's "differences" rest on rough assumptions make them useless. Plaintiffs admit, for instance, that the alleged "differences" were based on calculations

---

[3]     These figures are the weighted averages from Ex. 84 at Ex. A.

5

for only 8,400 of the 9,500 employees slotted to go to Hospira as of January 2004. (Pl. Resp. To SOMF ¶ 43-44). The 1,100 missing employees could have easily swamped out the alleged "differences." In fact, Abbott has supplied an uncontested affidavit explaining why those missing employees and other rough assumptions – all discussed in contemporaneous Hewitt emails – resulted in an "artificially higher average age and service" for the Hospira employees. (SOMF ¶ 43-46). Plaintiffs' bare "denials" of those sworn facts "unaccompanied by statements of any [contrary] facts which would be admissible in evidence at a hearing, are not sufficient to raise a genuine issue of fact." *United States v. Raymond*, 228 F.3d 804, 809 (7th Cir. 2000).

### 3. Plaintiffs Failed To Identify Any "Specific Fact" Suggesting The Decision Makers Knew About, Much Less Found "Essential," The "Differences" They Rely Upon.

Plaintiffs make no effort to meet the second prong of the *Andes* standard. They never so much as allege that the "differences" they cite – a couple of years difference in age and service and a 10% difference in employees over 40 – were even considered when reaching the spin decision, much less that they were "essential" to that decision. To avoid summary judgment, Plaintiffs must "come forward with evidence of specific facts to raise a genuine issue of fact as to whether [Abbott] intended to discriminate against this particular division" based on the identified "characteristic." *Deich-Keibler,* 2007 WL 1827260, at *4.

Plaintiffs have no such "specific facts." Abbott's decision makers – including both Mr. White and Mr. Freyman – swore they never knew and still do not know "whether the cost of providing benefits to the average HPD employee was higher, lower or the same as the employees in the other Abbott divisions." (Ex. 87, M. White Dep. II at 55-56; Ex. 72, T. Freyman Dep. at 37-38). Mr. White simply assumed – correctly – that the various divisions "all had the same mix of benefits so it stands to reason they'd all be the same." (Ex. 87, M. White Dep. II at 55-56).

Plaintiffs offer no contrary evidence. They offer nothing suggesting that the decision makers (Abbott's Board, CEO and CFO) were aware of the purported differences they rely upon. And they concede the documents explaining the spin rationale – *e.g.*, the June and August 2003 board minutes and Miles White's detailed board presentation – make no mention of benefits issues to justify the spin, much less those specific differences. (Pl Resp. to SOMF ¶¶ 26-36). Without any evidence the decision-makers were aware of the alleged differences, Plaintiffs cannot show they were "essential" to the spin decision.

On the contrary, Plaintiffs admit – even proclaim – that Abbott's documents confirm that benefits costs would be "the same" in all divisions. They cite documents generated weeks before the spin decision stating that the expected drop in pension costs from an HPD spin would be "20% in line with payroll." (Pl. Ex. 15 at 8). In other words, the pensions costs for HPD employees were exactly average, which is the opposite of a "special" ERISA characteristic. Abbott assumed any reduction would be "in line" with headcount reduction because Abbott allocates a uniform benefit cost to all employees – a point Abbott made in its opening brief supported by sworn testimony. (SOMF ¶ 39). Plaintiffs studiously ignore that undisputed fact.

The fact that Plaintiffs' purported "differences" were not "essential" is also definitively confirmed by the fact that they were first calculated in January 2004 – six months after the Board reached a "firm consensus . . . to proceed with the execution of the initial phases of the proposal" (Ex. 26 at A023827) and four months after the Board approved public disclosure of the spin (Ex. 39 at A013659). Indeed, all of the purported evidence Plaintiffs rely upon when falsely contending that "HPD was an older division" relates to information developed after Mr. White and Mr. Freyman identified core HPD as the spin candidate, proposed the spin to Abbott's Board on June 19, 2003, and obtained Board approval to proceed with the spin on June 20, 2003. (*See* Pl. Statement of Additional Facts, ¶¶ 20-23 (citing materials from July to September 2003)).

Obviously, statistics generated after the spin decision could not be "essential" to the decision. In an effort to avoid that case-ending problem, Plaintiffs note that the "final" Board approval did not occur until March 2004. But they offer no evidence that the spin rationale ever changed after June 2003, or that benefits costs ever became some sort of tipping point for making the spin "official" in March 2004. In fact, the August 2003 decision to publicly disclose the spin was based on the conclusion that the "*original* strategic rationale remains intact." (Ex. 38 at A013683 (emphasis added)). Quite simply, nothing supports Plaintiffs' conclusory allegation that their purported "differences" were "essential" to the "final" board approval.

In an alternative effort to resolve their timing problem, Plaintiffs argue that the later-estimated demographic differences "reinforced" the pre-existing "perceptions" of the "Abbott managers charged with planning and implementing the spin-off." (Pl. Mem. at 16-17). That is neither true nor relevant. Plaintiffs have offered no evidence that the mere "perceptions" of non-decision makers – those tasked with "planning and implementing" the spin – were "essential" to the massive decision. And it remains undisputed the decisions makers did not rely on Plaintiffs'

alleged "differences." (*See* Ex. 87, M. White Dep. II at 55-56; Ex. 72, T. Freyman Dep. at 37-38).

Plaintiffs' failure to meet the *Andes* standard ends Count I. Without evidence that Abbott "discriminated" against core HPD because of a "special" ERISA-related characteristic, Plaintiffs are reduced to contending that benefits costs drove Abbott to reduce the size of its workforce. Even if there were evidence to support that contention (there's none), nothing supports the fanciful notion that § 510 requires companies to maintain the size of their workforce. Rather, Plaintiffs must show that HPD was specifically targeted because of some "special" ERISA characteristic – a claim that cannot survive their admission that HPD had "essentially the same" demographics as the other spin candidates.

### B.     Plaintiff's Case Also Fails Under A *McDonnell-Douglas* Analysis.

Even if the Court elected to proceed under the *McDonnell-Douglas* framework rather than *Andes*, Plaintiffs' claim still fails as a matter of law. The "ultimate standard" under that framework requires a "but for" analysis: "[T]he plaintiff must demonstrate that the employer would not have made the adverse employment decision in question *but for* his membership in a protected class." *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1061 (7th Cir. 2003) (emphasis added). For many of the same reasons Plaintiffs cannot satisfy the *Andes* standard, Plaintiffs cannot meet their burden under *McDonnell-Douglas*.

### 1.     Plaintiffs Cannot Proceed Under the Direct Method Of Proof.

Plaintiffs argue that they have identified sufficient evidence to proceed under the "direct method" of proof rather than the *McDonnell-Douglas* "indirect method." Pl. Mem. at 16. This is not a serious argument. Proving discriminatory conduct through the direct method "essentially requires an admission by the decision maker that his actions were based on the prohibited animus." *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005). Short of a "smoking gun" admission, a plaintiff must at least identify a "convincing mosaic" of circumstantial evidence that "point[s] *directly* to a discriminatory reason for the employer's action." *Id.* (emphasis added) (citing *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003).

But Plaintiffs do not claim to have a "smoking gun," and cannot credibly claim to have a "convincing mosaic" considering they are attempting to rebut a business rationale repeatedly confirmed by dozens of documents and every Abbott witness. To attempt to overcome Abbott's uniform documentation and sworn testimony, they are relying on supposed inferences

manufactured from issues like alleged cost savings and concerns about rising benefits costs – none of which "point[s] *directly* to a discriminatory reason for [Abbott's] action." *Id.*

Moreover, Plaintiffs fail to cite any evidence that the decisions makers relied on any such issues when making the spin decision. That, by itself, precludes proceeding under the "direct method." In *Isbell*, for instance, the Seventh Circuit rejected application of the direct method because "there was no evidence that the studies [allegedly showing an age bias] were used by the decision makers involved in the decision to eliminate" the plaintiffs' jobs. *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 795 (7th Cir. 2005); s*ee also Cerutti v. BASF Corp.,* 349 F.3d 1055, 1062-63 (7th Cir. 2003) (rejecting direct method because of the absence of evidence that discriminatory statements by non-decision makers led to terminations).

### 2. Plaintiffs Have Failed To Establish A *Prima Facie* Case.

To establish a *prima facie* case through the "indirect method," Plaintiffs must show they suffered an adverse employment action "under circumstances that provide some basis for believing that the prohibited intent…to prevent the use of benefits was present." *Isbell,* 418 F.3d at 796; *accord Kampmier,* 472 F.3d at 943. In an effort to make this showing, Plaintiffs rely upon (a) the alleged avoidance of benefits costs from the spin, (b) Abbott's purported concern about increasing pension costs; (c) Abbott's alleged "targeting" of only "older" divisions as spin-off candidates; and (d) the fact that Abbott discussed benefits while implementing the spin after the June 2003 board approval. None of this suffices to meet Plaintiffs' burden.

### a. Benefits "Savings" Viewed In The Abstract Are Insufficient To Establish A *Prima Facie* Case.

With respect to avoiding benefits costs, the Third Circuit's recent ERISA decision in *Jakimas v. Hoffman-La Roche*, 485 F.3d 770 (3d Cir. 2007), squarely rejects the notion that benefits savings establish a *prima facie* case where, like here, the Plaintiff fails to account for the "costs" associated with achieving those "savings."

Similar to the current case, the *Jakimas* plaintiffs retained "exactly the same" jobs and "job titles" even after Hoffman-La Roche "outsourced" their jobs to an independent contractor ("JCI"). *Id.* at 775. Roche originally told the employees that their compensation and benefits would remain "comparable" at JCI, *Id.* at 774, but JCI ultimately declined to offer a pension. *Id.* at 775. Plaintiffs then alleged that the "motivating factor" for the outsourcing decision was

9

eliminating pension benefits.  Roche contended it outsourced the jobs simply for efficiency reasons and to "improve the quality of services."  *Id.* at 788.

The Third Circuit affirmed summary judgment for Roche.  The Court rejected the argument that $22 million in pension savings was enough to clear even the initial low hurdle of a *prima facie* case.  The savings were insufficient, the Court reasoned, because the plaintiffs "failed to consider any costs that Roche incurred by outsourcing," including the "millions" Roche paid under the outsourcing agreement.  *Id.* at 786-87.

Here, Plaintiffs' argument suffers from the same failing.  They offer up alleged "savings" without considering the costs Abbott incurred by spinning Hospira.  Plaintiffs suggest that Abbott's 2004 pension and retiree medical expenses would "decrease by ███████████ ██████ respectively," and that Abbott would "experience a one-time gain of ████████ due to the elimination of retiree medical expense…"  Pl. Mem. at 5.  These numbers pale, however, in comparison to the costs and lost sales Abbott incurred:

| Costs and Lost Sales | Value (approximate) |
|---|---|
| Direct transaction costs | $48 million |
| Pension "true up" per the EBA | $45 million |
| Net assets transferred to Hospira | $767 million |
| Annual sales attributable to Hospira | $2.4 billion (2003) |

(Answer to Pl. SAMF at Ex. 1, A001136-37).

This summary is by no means exhaustive of all of the costs incurred or future revenue lost.  But even these few numbers refute Plaintiffs' fanciful argument.  It makes no sense to argue that Abbott abandoned *$2.4 billion* in annual sales and spent *$870 million* (transaction costs, pension "true up" plus asset transfer) simply to avoid annual benefits costs of ████████ plus a one-time ███████ paper gain.  Thus, as in *Jakimas*, this argument does not establish "circumstances that provide some basis for concluding" the prohibited intent was present.

> **b.  Concern About An Industry-Wide Rise In Benefits Costs Does Not Establish A *Prima Facie* Case**.

Equally unpersuasive is Plaintiffs' assertion that in December 2002, before the spin decision, Abbott's Board expressed concern about rising pension costs – an issue that virtually every major company faced at the time due to the falling stock market and an issue that a Fortune 100 company like Abbott with a market capitalization currently exceeding $81 billion could easily manage.  (Ex. 34 at A023293, A023306-07; Ex. 87, Miles White Dep. II at 7-8, 14; Ex.

10

72, T. Freyman Dep. II at 24). No matter how theatrically Plaintiffs present this argument – a "board revolt," a "ceaseless" effort to achieve benefits savings, a "cast of characters" approving benefits reductions – they cannot establish a *prima facie* case.

If Plaintiffs' theory had any merit, every corporate reorganization "could be challenged under Section 510, and such claims would be immune to summary judgment" given the reality that we live an "era when benefits costs are ever increasing" and, thus, companies are *always* concerned about benefits costs. *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 980 (5th Cir. 1993); *see also Regel v. K-Mart Corp.,* 190 F.3d 876, 881 (8th Cir. 1999) (holding that concerns about benefit costs "not sufficient standing alone to prove the requisite intent by the path of pretext").

But that is not the law. It could not be more well established that "[t]emporal proximity, alone, is not enough to establish discriminatory intent." *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 939 (7th Cir. 2007). The "mere fact that one event preceded another does *nothing* to prove that the first event caused the second." *Id.* (emphasis added) (quoting *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstien, P.C.,* 277 F.3d 882, 895 (7th Cir. 2001). A plaintiff "needs more than a coincidence of timing" to make a *prima facie* case; they must also present evidence to "reasonably suggest that the two events are somehow related to one another." *Bilow v. Much Shelist Freed Denenberg Ament,* 277 F.3d 882, 895 (7th Cir. 2001); *accord Tomanovich v. City of Indianapolis,* 457 F.3d 656, 665 (7th Cir. 2006) (same); *Wyninger v. New Venture Gear, Inc*., 361 F.3d 965, 981 (7th Cir. 2004) (same).

Here, Plaintiffs are relying purely on "temporal proximity" and nothing else. Aside from timing alone, they have cited no evidence to suggest that a purported concern about rising pension costs had any connection to the spin decision. Abbott, in fact, *did* take action to address rising pension costs in the summer of 2003. It made modest changes to its benefits plans, including, for instance, reducing its basic pension plan formula for future service only. *See* Pl Ex. 7 at A007576. Thus, rising pension cost concerns led to a plan modification, not to the creation of a separate and independent $6 billion company that is thriving in the marketplace.

Plaintiffs' theory also defies economic common sense. They say Abbott was concerned that pension contributions would "mushroom" from ███████ in 2002 to ███████ in 2004 and that a paper equity charge of ███████ to ███████ would be required in 2003. (Plaintiffs' Mem. at 2-3). So to address those issues, Abbott decided to eliminate 25% of its world-wide workforce responsible for generating $*2.4 billion* in annual sales? And it took that

step even though 25% of its work force was responsible for only 25% of the identified funding and equity issues? Simple arithmetic demonstrates the fallacy of that theory – Abbott would have lost multiples more than it gained. The theory is also completely unsupported because not a single document discussing the purpose of the spin mentions pension costs.

          **c.**    **Discussions About How To Address Benefits When *Implementing* The Spin Fail To Establish A *Prima Facie* Case.**

In their next effort to establish a *prima facie* case, Plaintiffs confuse *implementing* the spin with the *rationale* for the spin decision. The various Board minutes and Mr. White's presentation detail what they concluded was the "compelling strategic *rationale*" for the core HPD spin – a rationale the documents confirm had nothing to do with benefits issues.

Once they decided to move forward to *implement* the spin, however, Abbott tasked literally hundreds of people with figuring out how to unravel 10,000 employees to form a separate company. (See Ans. to Pl. SAMF at Group Ex. 2, A004642-55). This was a Herculean task that required an intense analysis of many issues, including manufacturing, support services, licensing agreements, intellectual property, legal support, physical assets, and property. (*Id.* at A007231, 7242-46; H03822-74). And, yes, *implementing* the spin required Abbott to address benefits issues. Plaintiffs seize on that fact as if had something to do with issue before the Court. It does not.

None of the benefits discussions Plaintiffs cite remotely supported the already fully-documented *rationale* for the spin. For instance, Plaintiffs spend an inordinate amount of time discussing the internal debate about whether Abbott would retain or transfer the pension assets necessary to support core HPD pensions. (Pl. Mem. at 8-14). Keeping the asset would have amounted to Abbott maintaining and administering a pension fund to provide for future retirements from a separate company. (Hosp. Ex. 2, White Tr. at 64-65). It would also have prevented employees from continuing to "grow into" their pensions after the spin. (*Id.*) For those and other reasons, Abbott ultimately decided to make a clean break and transfer the asset to Hospira along with an extra $45 million to assist with future funding issues. (*Id.*) Plaintiffs fail to explain how that discussion – a pure implementation issue – related in any way to the decision to proceed with the spin in the first place.

As if there was something sinister about it, Plaintiffs also focus on the fact that Abbott allegedly took steps to preclude a mass retirement of eligible HPD employees immediately

before the spin. The reality, however, is that no company permits its employees to engage in the utter windfall of retiring (thus beginning to collect retirement benefits) at the same time they maintain their jobs (thus continuing to collect their salaries). *See* Hospira Open. Br. at 14-15 (citing *Rowe v. Allied Chem. Hourly Employees' Pension Plan*, 915 F.2d 266, 267-68 (6th Cir. 1990) (holding that employees of sold-off facility were not eligible to "retire," start collecting their pension, and then continue working for same company under different ownership).

The HPD spin was no different because all of the employees were keeping the same jobs, working at the same desks, with all the same responsibilities, for a piece of the same company that would administer the same transferred pension assets. Regardless of whether Plaintiffs agree with Abbott's decisions, they have failed explain how that issue – again, a pure implementation issue – relates in anyway to the decision to proceed with spin in the first place.

Inevitable and unavoidable implementation issues like these simply do not suggest "circumstances that provide some basis for believing that the prohibited intent…to prevent the use of benefits was present." *Isbell,* 418 F.3d at 796.

> ### d. Abbott's Broad Strategic Review Refutes, Rather Than Supports, Plaintiffs' Efforts To Establish A *Prima facie* Case.

In a final effort to overcome their lack of evidence, Plaintiffs suggest it helps their case that the HPD spin resulted from a broad strategic review of six possible options, including both acquisitions and divestitures. (SOMF ¶¶ 22. 24, 25). But that review refutes, rather than supports, Plaintiffs' position.

Contrary to their rank speculation that the HPD spin was designed to "reduce head count" to cut pension costs, the two major acquisitions under consideration would have *increased* head count. Moreover, the documents make no mention of "headcount reduction" as a purported advantage of any of the four divesture options. (*See e.g.* Pl. Ex.43, cited in Pl. Mem. at 18; Abbott Exs. 14-22, 27, 38-39, 41-46).

Despite this, Plaintiffs assert that this strategic review constitutes a "stunning admission" because Abbott has "conceded" that three of the four divestiture candidates – HPD, ███, and ███ – had nearly identical demographics. (Pl. Mem. at 17). From this, Plaintiffs leap to the conclusion that the other two spin candidates had the "same high concentrations of older, longer-service, employees as HPD." (*Id.*) But they offer no evidence. As explained earlier, the data in the record proves that all three spin candidates had essentially the same demographics as the rest

of the company. (*See* chart on page 5). Thus, Plaintiffs present no evidence whatsoever that Abbott was selecting strategic options based on ERISA characteristics.

### 2. Plaintiffs Cannot Show Abbott's Explanation For The Spin Is A Lie.

Even if they could establish a *prima facie* case, Plaintiffs cannot establish pretext. Plaintiffs never dispute that Abbott has articulated a legitimate, non-discriminatory reason for the spin decision. Thus, they can avoid summary judgment only if they present evidence that Abbott's reason is pretextual – that is, a "lie". *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 397 (7th Cir. 2007). As the Seventh Circuit recently emphasized, "the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 418 (7th Cir. 2006) (emphasis in original).

Here, Plaintiffs admit that the documents state that the "spin-off was designed to leave Abbott with a higher-growth, higher return and less-asset-intense business." (Pl. Mem. at 21). The documents also confirm that Abbott believed the "strategic rationale" for the HPD spin was "compelling," considering that core HPD had trouble competing for resources ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████ (Ex. 27 at A013991; Ex. 87, M. White Dep. II at 52-53). And that rationale is confirmed by the sworn testimony of the highest officers in the company. (*See* Ex. 87, M. White Dep. II. at 50; Ex. 72, T. Freyman Dep. II at 171-72).

Therefore, to meet their burden, Plaintiffs must establish that this extensively-documented "compelling" rationale "did not actually motivate" Abbott's decision. *Forrester,* 453 F.3d at 418. This requires Plaintiffs to produce evidence demonstrating that Mr. White and Mr. Freyman lied at their depositions, that Morgan Stanley conspired with Abbott to manufacture false financial justifications for the spin, and that Abbott management repeatedly lied to its Board of Directors (assuming the Board was not in on the alleged conspiracy).

Plaintiffs have evidence for none of this. And "mere speculation" coupled with a plaintiff's "subjective believe" is not enough to show pretext, particularly given that the Seventh Circuit is "skeptical" of "elaborate plot theories." *Murray v. Chicago Transit Authority,* 252 F.3d 880, 888 (7th Cir. 2001) (citations and quotations omitted). Here, Plaintiffs' entire pretext

theory boils down to their naked assertion that Abbott's rationale for the spin is not "credible." But, of course, a plaintiff's "incredulity does not adequately substitute for evidence on summary judgment." *Nelson v. Potter*, 2007 WL 1052490, *8 (N.D. Ill. April 2, 2007).

Indeed, Plaintiff' claimed incredulity does not passed the straight-face test. They say this chart is a "lie:"



(*Id.* at A013994). According to Plaintiffs, this financial analysis could not "credibly" justify the spin because it shows "only" a ▇ increase in growth rate, a ▇ increase in net earnings rate, and an increase in return on assets of only ▇. (Pl. Mem at 21). This argument displays a profound lack of knowledge about finance. Differences like those compound year after year to achieve a larger impact over time, which can make all the difference in the value of shares of stock.

In any event, regardless of Plaintiffs' feigned skepticism, the relevant question is not whether Plaintiffs believe Abbott had "good" reasons for the spin, but rather whether they were the "true" reasons. Obviously, the Board found this financial analysis "credible" and approved the spin on that basis. And there is no evidence that Mr. White did not honestly believe Morgan Stanley's financial analysis justified his spin recommendation. On the contrary, he concluded the strategic rationale was "compelling" in a written document drafted long before this litigation began. (Ex. 27 at A013991).

Plaintiffs also assert that Mr. White lied when stating that spinning HPD would leave Abbott with a "higher growth profile." They base that accusation on Morgan Stanley's finding that the HPD spin would not ▇▇▇▇▇ Abbott's ▇▇▇▇▇▇▇▇▇ (Pl. Mem. at 22). But Plaintiffs offer no explanation about why a statement concerning "fundamental growth trajectory" contradicts a statement regarding "higher-growth." Nobody ever suggested

that a ▮ percent increase was a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. But, in fact, it *is* higher growth profile and the Board *did* approve the spin on that basis.

Finally, Plaintiffs suggest that Abbott's proffered explanation is not "credible" because Abbott is taking the "extreme position" that benefit costs did not play "any role whatsoever in its decision to select [core] HPD to be spun off." Pl. Mem. at 21. There is nothing "extreme" about the truth. It is undisputed that *none* of the documents explaining the spin rationale – again, including board minutes, CEO presentations, Morgan Stanley reports – ever mention benefits costs as a relevant consideration.

Ultimately, Plaintiffs come nowhere close to establishing pretext. There is simply no evidence that Mr. White, Mr. Freyman, Morgan Stanley, and Abbott's Board of Directors are all lying about their well documented and uniform explanation for proceeding with the spin. Thus, the Court should grant summary judgment on Count I.

## II. Abbott Is Entitled To Summary Judgment On Count II (No Hire Claim)

For the no-hire claim, Abbott has made three arguments – it adopted Hospira's arguments, contended that the no-hire claim was moot, and noted that the claim could not survive as an independent § 510 claim if Count I fails. (Abbott Br. at 17-19).

### A. Plaintiffs Make No Effort To Establish That The Legitimate Basis For The No-Hire Policy Is Pretext

On the pretext issue under *McDonnell-Douglas*, Plaintiffs fail completely to respond to Hospira's evidence establishing a legitimate reason for the reciprocal no-hire policy – including the fact that it is a standard, "Best Practice" for spin transactions to promote stability by preventing employee migration between the resulting companies. (Hospira Mem. at 1, 5, 11-13); *see also Deich-Keibler v. Bank One,* 2007 WL 1827260 (7th Cir. June 26, 2007) (noting that sale of Bank One division included a no-hire provision).

Plaintiffs never contest the legitimacy of that explanation as it relates to employees wishing to switch between companies "*after* the spin-off." (*Id.* at 31). Instead, they limit their argument to those who wished to "retire *before* the spin-off date," contending there is no explanation for applying the policy to *pre*-spin retirees (*Id.*) There was, of course, a legitimate explanation, which Hospira explained in detail in its opening brief and will certainly explain again in its reply brief. Abbott again adopts Hospira's reply brief to avoid duplicative briefing.

In any event, Plaintiffs' limited argument (relating only to *Hospira's* hiring of *pre*-spin Abbott retirees under Count III) does not apply to Count II against Abbott (relating to *Abbott's*

16

hiring of *post*-spin former HPD employees). Because Plaintiffs' make no argument about Count II, the Court should grant summary judgment on that count.

In a footnote, Plaintiffs claim they do not understand how Hospira's memorandum applies to Count II. (Pl. Mem. at 23, n. 9). But, of course, the bulk of Hospira's memorandum is directly applicable – it relates to Plaintiffs' inability to show that the non-discriminatory reason for the *reciprocal* no-hire policy is pretext. Pursuant to the Court's suggestion to avoid duplicative briefing, Abbott adopted Hospira's memorandum rather than repeating the very same argument. Contrary to their claimed confusion, Plaintiffs' specifically argued that Hospira "only purports to explain the two-year hiring restriction ***adopted by Abbott***." (Pl. Mem. at 31). Plaintiffs cannot avoid summary judgment by feigning confusion.

### B. Plaintiffs' No-Hire Claim Is Moot Because The No-Hire Policy Expired

Count II is also moot because the no-hire policy expired in May 2006. That means Hospira employees are now free to apply for any Abbott job they want.

Plaintiffs try, but fail, to distinguish *Eichorn v. AT&T Corp.*, 484 F.3d 644, 658 (3d Cir. 2007), which held that the plaintiffs were "***without a remedy***" for an alleged § 510 violation after a no-hire policy expired. The Third Circuit correctly explained that § 502(a)(3) permits only "traditional equitable remedies," not "compensatory damages" and, thus, precludes requests to "adjust its pension records retroactively to create an obligation to pay the plaintiffs more money, both in the past and going forward." *Eichorn*, 484 F.3d at 654-55.

In an effort to distinguish *Eichorn,* Plaintiffs assert they are not asking for a "retroactive" record adjustment to obtain money damages and, instead, only want to be "immediately reinstated into available positions at Abbott and into each of Abbott's employee benefits plans." (Plaintiffs' Mem. at 25). Presumably, Plaintiffs are referring to a Court order requiring Abbott to hire any former HPD employee who wants any available position. That mandatory "reinstatement" order would apply, Abbott supposes, even if more qualified candidates are seeking the same job or if the HPD employee has insufficient experience and/or qualifications.

That is just nonsense. Reinstatement is not an available remedy here. "Reinstatement" refers to placing terminated employees backed into the position they lost. Reinstatement, thus, is not an available remedy when – like here – the position no longer exists because the relevant business unit was sold, closed, or spun. In *Alexander v. Bosch Automotive Systems, Inc.,* 2007 WL 1424299, *5 (6th Cir. May 14, 2007), for instance, the Sixth Circuit held there was *no*

*available remedy* after a plant closing in a § 510 case.  The Court also specifically explained that "reinstatement is not possible because [defendant] closed the ... plant prior to the commencement of these proceedings." *Id.*; *See also Millsap v. McDonnell Douglas Corp.,* 368 F.3d 1246, 1252 (10th Cir. 2004) (reinstatement "impossible" where plant in question has been closed).

Moreover, Plaintiffs' complaint in Count II is about a *hiring* policy.  Before the policy expired, Plaintiffs were complaining about a policy preventing them from *applying* for Abbott jobs.  Now, they are perfectly free to do so.  Plaintiffs were not complaining about the lack of a *guarantee* they would *obtain* any job for which they applied.  Thus, they cannot avoid *Eichorn* by asserting an equitable right of mandatory "reinstatement" that lacks any connection to Count II, particularly given the contrary case law.

Plaintiffs alternatively assert that that the expired no-hire policy still has a continuing effect with respect to "bridging rights."  That is not true.  Plaintiffs are conflating two separate and distinct issues.  The no-hire policy arose from a provision in the Employee Benefits Agreement between Abbott and Hospira executed in April 2004.  (Abbott Ex. 40 at 14).  The bridging rights, in contrast, are determined solely by the terms of Abbott's benefits plan, which Abbott amended in May 2006 to treat former HPD employees as new hires.  (Compare Abbott Ex. 40 with Ans. to Pl. SAMF at Ex. 3).  Thus, with or without the no-hire policy – and regardless of *when* they are hired back – former HPD employees have no bridging rights.

Plainly, one thing has nothing to do with the other.  Plaintiffs have asserted no independent claim relating to bridging rights for former HPD employees now re-employed by Abbott.  Rather, they claim they were losing "bridging rights" as a *consequence* of the no-hire policy.  (Abbott Ex. 61 at ¶80)  Because the no-hire policy has now expired and Plaintiffs have raised no independent claim about bridging rights, Count II should be dismissed.

To the extent, however, the Court permits Plaintiffs to morph their no-hire claim into a stand-alone claim about bridging rights, that new claim should be immediately dismissed.  It is well settled that § 510 is not implicated by plan amendments, such as Abbott's amendment relating to the bridging rights for former HPD employees.  As the Seventh Circuit has explained, "a fundamental prerequisite to a § 510 claim is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way." M*cGann v. Auto-Body North Shore, Inc.,* 7 F.3d 665 (7th Cir. 1993).  Section 510 simply "does not limit a plan sponsor's ability to design or amend a plan in any way it sees fit…"

*Coomer v. Bethesda Hospital, Inc.*, 370 F.3d 499, 510 (6th Cir. 2004); *accord Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *McGath v. Auto-Body North Shore, Inc.*, 7 F.3d 665, 670 (7th Cir. 1993); *Bronk v. Mountain States Telephone and Telegraph, Inc.*, 140 F.3d 1335, 1338 (10th Cir. 1998).[4]

### C. The No-Hire Claim Cannot Stand As An Independent Claim.

Plaintiffs attempt to avoid Abbott's third argument by falsely accusing Abbott of plowing old ground. (Pl. Mem. at 26). But Abbott's point, which Plaintiffs ignore, is that Count II rises and falls with Count I, given Plaintiffs' theory that it is "part and parcel" of Abbott's supposed unlawful scheme. (Abbott Br. at 19). If Count I fails, Count II can only be viewed as a naked failure to hire claim. Such a claim, standing alone, could not violate § 510 under the voluminous case law cited by Abbott in its opening brief. *Id.*

## III. Abbott Is Entitled To Summary Judgment On Count IV (Fiduciary Breach Claim).

For Count IV, Plaintiffs studiously ignore a fact that places a powerful spotlight on their claim's legal deficiency: Hospira announced its plan changes in June 2004, which was *over six months before* they went into effect on January 1, 2005. Plaintiffs' entire argument, then, is that Abbott should have pre-announced part of Hospira's plan *even earlier* in the fall of 2003. An earlier announcement, Plaintiffs assert, would have enabled them to: (a) consider retiring early; (b) seek other employment; and/or (c) petition against any benefits changes. (Pl. Mem. at 42-44). But all of these options were still available in June 2004. The retirement-eligible employees could have retired, others could have sought alternate employment, and they all could have petitioned against any of the announced changes.

That reality permeates both of Abbott's arguments: (1) Abbott had no fiduciary duty with respect to Hospira's 2005 benefits plan and (2) Plaintiffs' cannot show any possible harm from Abbott's failure to pre-announce select parts of Hospira's 2005 benefits plan.

### A. Regardless Of Its Alleged Fiduciary Duty Concerning The Transitional Plan, Abbott Had No Possible Duty With Respect To Hospira's 2005 Benefits Plan.

---

[4]     In any event, a new stand-alone, bridging-rights claim can hardly be treated as part of this 10,000-person class action. A complaint about bridging rights impacts none of the class representatives. Rather, it impacts *only* former HPD employees now employed by Abbott, which is surely a tiny number. Thus, for any new bridging-rights claim, the Court should at least decertify the class. *Clark v. Chrysler Corp.,* 673 F.2d 921, 924 (7th Cir. 1982) (decertifying class alleging race discrimination for failure to satisfy the numerosity requirement of Rule 23).

Plaintiffs never acknowledge the lack of any authority for "imposing fiduciary liability based on an employer's failure to inform employees of the terms of a successor's benefits." *Ames v. American Nat'l Can Co.*, 1997 WL 733893 (N.D. Ill. 1997), *aff'd*, 170 F.3d 751 (7th Cir. 1999)**.**  Instead, Plaintiffs devote most of their brief to arguing that Abbott "knew" Hospira's Board would freeze certain benefits effective January 1, 2005.  Even if that were true (it is not), it would be completely irrelevant to the legal issue before this Court.

ERISA fiduciary duties are "plan-specific."  *Beach v. Commonwealth Edison Co.,* 382 F.3d 656 (7th Cir. 2004).  Here, there are three distinct plans – Abbott's own pension plan ("ARP"), the Transitional Plan in place at Hospira until December 31, 2004 (the "Transition Plan"), and Hospira's subsequent benefit plans (the "2005 Benefits Plans").  Plaintiffs repeatedly assert Abbott had a fiduciary duty *only* with respect to the first two plans:

- "Abbott's **fiduciary duty** of disclosure is triggered by the existence of both the **ARP** – its own plan that the covered the class members until the spin date – and its subsequent creation and founding of the Abbott-Hospira Transitional Annuity Retirement Plan ('**Transitional Plan**')."  (Pl. Mem. at 39).

- "Abbott's role as a **fiduciary** in the **ARP** and in the creation and funding of the **Transitional Plan** necessitated that Abbott disclose the decision to freeze the pension plan and eliminate retiree medical benefits, both of which were made while the **ARP** and the **Transitional Plan** were in place."  (*Id.* at 40).

But Plaintiffs do not claim Abbott made any misstatement concerning the ARP and the Transitional Plan.  Nor could they.  When announcing the spin-off in August 2003, Abbott advised affected employees they would have the same benefits through the end of 2004.  (Abbott SOMF ¶54).  Plaintiffs never contest the accuracy of that statement.  (Pl. Resp. SOMF ¶54)

Instead, Plaintiffs accuse Abbott of making a "misrepresentation" *only* about Hospira's 2005 Benefits Plans.  But Plaintiffs never contend that Abbott had a fiduciary duty over those plans.  That ends the analysis.  It is black-letter law that a fiduciary breach case fails if the plaintiff cannot establish a duty.  *Beach v. Commonwealth Edison,* 382 F.3d 656 (7th Cir. 2004); *Ames v. American Nat'l Can Co.,* 1997 WL 733893 (N.D. Ill. 1997), *aff'd*, 170 F.3d 751 (7th Cir. 1999); *Adams v. Lockheed Martin Energy Systems,* 2006 WL 2430047 (6th Cir. Aug. 21, 2006).

Plaintiffs fail to distinguish any of these cases.  To attempt to avoid *Beach,* Plaintiffs argue that the Seventh Circuit "left open the question of whether disclosure was required in the case of a new plan."  (Pl. Mem. at 39).  But the Court was referring to the possibility of applying

20

the Third Circuit's *Fischer* standard to an employer's **own** new plan – that is, whether a fiduciary duty is triggered for a new plan (as opposed to amending an "existing plan") "when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Beach*, 382 F.3d at 659 (citing *Fischer v. Philadelphia Electric Co.*, 96 F.3d 1533, 1539 (3d Cir. 1996)). *Beach* was not suggesting that the *Fisher* standard might apply to **another company's** new plan, *e.g.*, Hospira's 2005 Benefits Plans.

Equally unavailing is Plaintiffs' effort to rely on this statement from *Beach*: "A number of decisions address … whether ERISA requires plan sponsors to give accurate information about potential amendments to existing plans. *Varity* shows that candid and complete information is required if two plans are *in existence*, and the *sponsor* tries to persuade employees to give up benefits under one in exchange for benefits under the other." (*Beach,* 382 F.3d at 659 (emphasis added); Pl. Mem. at 39). This is exactly Abbott's point. *Varity* turns on the "sponsor's" statements about its *own* "two plans" already "in existence." Here, Abbott did not "sponsor" plans that did not even "exist" until Hospira's Board approved them on June 9, 2004.

Both *Ames* and *Adams* make the same point. When distinguishing *Varity* and rejecting an alleged fiduciary duty over a "successor's plan," the *Ames* court emphasized that "Varity Corporation was both the employer and the plan administrator." *Ames*, 1997 WL 733893, *15. Similarly, in the Sixth Circuit's *Adams* decision, where the employees kept the same jobs for a new employer under an outsourcing agreement, the Court stated that, "[u]nlike in *Varity*, the information conveyed by [the company] to Plaintiffs did not concern a plan administered by [the company]." 2006 WL 2430047, at *2-3. That is precisely the situation here – Abbott obviously did not sponsor or administer Hospira's 2005 Benefits Plans.

Ultimately, no court has ever gone as far as Plaintiffs ask this Court to go – that is, finding a fiduciary breach based on the failure to disclose the details of the not-yet-existing plan of another company. And it is not only *Beach, Ames,* and *Adams* that refute that notion, but other cases that Abbott also cited and that Plaintiffs ignore. *See, e.g., Coleman v. Gen. Elec. Co.*, 643 F. Supp. 1229, 1238-39 (E.D. Tenn. 1986) (seller cannot breach fiduciary duty by misrepresenting buyer's benefits); *Plummer v. Consol. City of Indianapolis*, 2004 WL 2278740, at *8-9 (S.D. Ind. Aug. 17, 2004) (potential buyer did not breach duty by misrepresenting post-closing benefits because, at the time, it had no fiduciary duty).

In an alternative effort to avoid this settled law, Plaintiffs seem to rely on the following logic: Abbott purportedly misrepresented the quality of its own ARP and/or the Transitional Plan (over which Abbott allegedly had a fiduciary duty) by failing to preannounce certain disadvantages of Hospira's 2005 Benefits Plan (over which Abbott has no alleged or actual fiduciary duty). In addition to the lack of any authority supporting that notion, the logic would make sense only if – unlike here – employees were asked to voluntarily "choose" between the two plans, in which case the comparative qualities of the two plans might be relevant.

*Varity, Beach, Adams*, and *Ames* all make that very point about a voluntary choice. *Beach* noted that *Varity* required "candid and complete information" about both plans only because the "sponsor *trie[d] to persuade* employees to give up benefits under one in exchange for benefits under the other." *Beach,* 382 F.3d at 659 (emphasis added). The Supreme Court in *Varity* similarly emphasized that the duty to convey accurate information about the "likely future" of the new plan existed only because the employees needed to "make an *informed choice* about continued participation" in the old plan. *Varity*, 516 U.S. at 502 (emphasis added). And *Adams* rejected the fiduciary breach claim, in part, because the employees "*did not have a choice* 'about continued participation' in [the old] plan – as in *Ames*, the business decision to outsource Plaintiffs foreclosed that option." 2006 WL 2430047, at *2-3 (emphasis added).

The present case is like *Adams* and *Ames*, not like *Beach* and *Varity*. The HPD employees "did not have a choice" about "continued participation" in Abbott's ARP and/or the time-limited Transition Plan. And Abbott was not attempting to "persuade" HPD employees to "choose" to between plans. Thus, the comparative qualities of the plans were irrelevant.

Perhaps recognizing this problem, Plaintiffs argue without explanation that Abbott's failure to preannounce Hospira's 2005 Benefits Plans prevented them from making an "informed choice." (Pl. Mem. at 39). What choice? Plaintiffs are perhaps referring to a "choice" about retiring early, seeking alternative employment, or protesting. But, again, all of these "choices" were fully available for over six months after Hospira's June 2004 announcement until the effective date of the changes in January 2005.

Ultimately, the resolution of this motion is simple and straightforward. Abbott is accused of making a misrepresentation *only* about Hospira's 2005 Benefits Plans and, yet, Plaintiffs never allege Abbott had a fiduciary duty over those plans.

**B.** **Plaintiffs Fail Completely To Show Any Harm From Not Having More Than Six-Months Notice Of The Details Of Hospira's 2005 Benefits Plan.**

Plaintiffs also fail to show any "harm" from Abbott's purported failure to preannounce Hospira's 2005 Benefits Plans. Instead, Plaintiffs baselessly accuse Abbott of "revisit[ing] the argument previously rejected by the Court." (Pl. Mem. at 42). That is not true. Abbott acknowledged in its opening brief that this Court previously noted that the Seventh Circuit has never "expressly" held that detrimental reliance is required and further noted the possibility of a "presumption" of detrimental reliance. (Abbott Ex. 67, Order dated April 3, 2007 at 4). Abbott accepted and attempted to account for the Court's findings.

Nevertheless, whether the standard is couched as a need to show "harm" or "detrimental reliance," Plaintiffs have failed utterly to raise a genuine issue of material fact – at the very least because the only "lost" opportunities they identify were available for over six months before the 2005 benefits changes went into effect. Moreover, with respect to the claimed lost job opportunities, Plaintiffs offer no response to the many cases Abbott cited holding that mere "[f]orbearance from seeking job opportunities is not sufficient to show detrimental reliance…" *Croslan v. Hous. Auth. for the City of New Britain*, 974 F. Supp. 161, 168-69 (D. Conn. 1997) (citing cases); Abbott Opening Mem. at 24 (citing many more cases). Summary judgment is thus appropriate when, like here, a plaintiff "can't specify where he might have applied and he doesn't know whether other jobs were available in any event." *Panzino v. Scott Paper Co*., 685 F. Supp. 458, 462 (D.N.J. 1988); *see also Bock v. Computer Assoc.'s Int'l Inc.*, 257 F.3d 700, 711 (7th Cir. 2001) (rejecting ERISA estoppel claim based on a lack of harm where "there has been no showing, for example, that Bock refused alternative employment on account of his belief in a generous severance provision").

Rather than pursue their lost-job-opportunity theory in the face of this settled law, Plaintiffs argue that "if the class members had known the truth about their future benefits, they could have complained to Abbott and demanded appropriate benefits in exchange for their agreement to become the new company's ready-made, pre-trained workforce." (Pl. Mem. at 42). Plaintiffs do not explain, however, how it would have made any difference whether they "complained" and "demanded" higher benefits after a pre-spin announcement rather than after Hospira's actual June 2004 announcement.

Either way, they had at least six months before the changes went into effect. In any event, why would an earlier pre-spin "demand" be more likely than a post-spin "demand" to achieve higher benefits going into the future? After all, Abbott had no right on a pre-spin basis to dictate the terms of Hospira's benefits plan after the Transition Plan expired. And Plaintiffs' claimed loss relates not to benefits Abbott promised, but rather to benefits they claim Hospira should have voluntarily provided.

Another obvious problem with this whole theory about losing the opportunity for a pre-spin "demand" is that any resulting "harm" is wholly speculative. Speculative harm is insufficient to survive summary judgment. *See Beatty v. North Central Co.'s, Inc.,* 170 F. Supp. 2d 868, 877 (D. Minn. 2001) ("Plaintiffs cannot rest their claim on mere speculative harm, as they have attempted to so here"), (*citing Howe v. Varity Corp.*, 36 F.3d 746, 755-57 (8th Cir. 1994)); *Baggett v. Woodbury*, 1987 WL 383796, at *10 (N.D. Fla. Jan. 16, 1987) (holding that the claim harm to the ERISA plan "entirely too speculative" because there is no bases to conclude that the outcome "would have been different in the event" the plaintiffs proposed procedure had been used); *Adams v. Ford Motor Co.*, 847 F. Supp. 1365, 1387-88 (E.D. Mich. 1994) (rejecting claimed injury as too speculative where "Plaintiff's only injury to date is that they do not have a Ford pension, which they perceive to be better than a Rouge Steel pension").

Indeed, Plaintiffs' claimed right to make a pre-spin "demand" for higher benefits is no different than cases holding that a plaintiff is not "harmed" by losing a non-meritorious claim for damages. In *Shields v. Local 705,* 188 F.3d 895, 901-02 (7th Cir. 1999), for example, the Seventh Circuit rejected a misrepresentation claim where the plaintiff alleged he was harmed by being misled into giving up an NLRB claim. The Court explained that the plaintiff failed to show he "suffered any detriment" (*i.e.*, harm) because he failed to demonstrate he "gave up a meritorious claim; forgoing a meritless claim causes no detriment." *Id.*

Similarly, the Plaintiffs here had no right to compensation for benefits reductions beginning in January 2005. Nor were they entitled to a *quid pro quo* for working at Hospira. And they also had no right to participate in the decision-making process about Hospira's benefits. Thus, giving up a right to "demand" something to which they had no right is not a cognizable harm – a fact that does not change merely because Abbott gave "transition bonuses" to *six* key employees deemed important to Hospira's future success. Pl. Ex. 76 at A022201; Ans. to Pl. SAMF at Ex. 4. As the court explained in *Eckelkamp v. Beste*, 201 F. Supp. 2d 1012, 1023 (E.D.

Mo. 2002), setting compensation levels for executives does not create ERISA fiduciary obligations because it is a "business decision" that "can still be made for business reasons" without implicating ERISA.  In contrast to those six bonuses, company-wide benefits for **10,000** employees are determined by market conditions, not by the naked "demands" of employees. Indeed, if a naked demand were enough, Hospira would have restored the frozen pension since this lawsuit is, in effect, a demand for higher benefits.

The unpublished case that Plaintiffs rely upon only illustrates the deficiency of their theory.  *See Hensley v. P.H. Glatfelter Co.,* 2005 WL 3158033 (W.D.N.C. Nov. 28, 2005).[5]  In that case, upon the sale of a division, the employer Glatfelter convinced its employees to delay retiring by *guaranteeing* the new company's benefits plan.  Glatfelter explained that the purpose of the guarantee was "to eliminate any concern employees may have about their post retirement medical coverage when they go to work for [the new company]." *Id.* at *1.  When the new company went into bankruptcy, however, Glatfelter refused to pay given a secret "side agreement" that its payment obligation was contingent upon the new company's ability to reimburse such payments.  *Id.*  While the district court's decision refers to the "opportunity to make further inquiry," the overall context makes clear that the required "harm" to the employees turned on their being convinced to accept employment at the new company in reliance on the misleading "guarantee." *Id.* at *5 (finding that the secret "side agreement" was "material" to an early retirement decision and that a reasonable jury could find that the failure to disclose the secret agreement could have harmed employees who elected against early retirement).

*Hensley* is easily distinguishable for an additional reason.  Unlike here, Glatfelter did not announce the "side agreement" six months before the effective date of the change in benefits. Instead, the Glatfelter employees found out about that secret agreement only when it was too late to consider retiring under the old plan.  Here, in contrast, every HPD employee had an opportunity to retire early, seek alternative employment, and/or protest the announced changes for a full six months before they took effect in January 2005.  There is no legally cognizable harm under such circumstances.  Thus, the Court should grant summary judgment on Count IV.

---

[5]      Abbott understands that the Court cited *Hensley* case in a footnote in its class certification ruling, a procedural context where courts generally accept as a true plaintiff's factual allegations.  Abbott does not believe this Court intended to definitively resolve this issue before full briefing on a full evidentiary record in the context of a summary judgment motion.

Dated:  July 23, 2007

Respectfully submitted,

ABBOTT LABORATORIES

By: _____s/Sean Nash_____
One of Its Attorneys

James F. Hurst
Joseph J. Torres
Sean Nash
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

## <u>CERTIFICATE OF SERVICE</u>

Sean Nash, one of the attorneys for Abbott Laboratories, hereby certifies that he has caused a true and correct copy of the foregoing ABBOTT LABORATORIES' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT to be served upon:

Mark A. Amadeo
Sprenger & Lang PLLC
1400 Eye Street, N.W.
Suite 500
Washington, D.C. 20005
**Counsel for Plaintiffs**

Michael M. Mulder
Meites, Mulder, Berger & Mollica
20 S. Clark Street
Suite 1500
Chicago, Illinois 60603
**Counsel for Plaintiffs**

Christopher D. Liguori
Jenner & Block LLP
One IBM Plaza
Chicago, Illinois 60611
**Counsel for Defendant Hospira, Inc.**

by electronic filing, this 23rd day of July 2007.


_____s/ Sean Nash____
Sean Nash