IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MYLA NAUMAN, JANE ROLLER, and )
MICHAEL LOUGHERY, )
)
Plaintiffs, )
)
) No. 04 C 7199
v. )
) Judge Robert W. Gettleman
ABBOTT LABORATORIES, and )
HOSPIRA, INC., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Myla Nauman, Jane Roller and Michael Loughery were employees in

defendant Abbott Laboratories' Hospital Products Division ("HPD") until April 8, 2004, when

Abbott spun HPD off into defendant Hospira, a newly created corporate entity. As part of the

spin-off, plaintiffs were transferred, along with approximately 10,000 other U.S.-based Abbott

employees, to Hospira, where they remain employed to this day. Plaintiffs assert a four count

class action pursuant to §§ 510 and 404 of ERISA, 29 U.S.C. § 1140 and § 1104, challenging the

spin-off and the manner in which it was conducted. In Count I, plaintiffs allege that Abbott

terminated the HPD employees with the specific intent to interfere with plaintiffs' attainment or

receipt of benefits under the various Abbott benefit plans. In Count II, plaintiffs allege that as

part of the unlawful scheme that included their termination, Abbott adopted a no-hire policy

under which it refused to rehire HPD employees who were transferred to Hospira for a period of

two years following the spin-off, effectively eliminating any rights plaintiffs could have retained

under the Abbott plans. Count III alleges that Hospira, by agreement with Abbott, also adopted

a no-hire policy under which it refused to hire any employee who chose to retire from Abbott

and collect retirement benefits under Abbott's benefits plans prior to seeking employment from Hospira. Plaintiffs assert that the conduct alleged in Counts I through III violates § 510 of ERISA. Count IV alleges that Abbott breached the fiduciary duty it owed plaintiffs as the administrator of their benefits plans by making deliberate misrepresentations about the benefits that post-spin-off employees could expect at Hospira, in violation of § 404 of ERISA.[1] Both defendants have now moved for summary judgement on all counts against them. For the reasons discussed below, the motions are denied.

## BACKGROUND

Abbott prides itself on offering an employee benefits package that provides incentives for its employees to stay with the company. During the period leading up to the events at issue, however, which took place roughly between late 2002 and late 2004, Abbott–like many other companies–faced economic and demographic pressures that resulted in increased costs to Abbott in providing certain benefits, particularly pension and retiree medical benefits associated with older workers. Abbott sought ways to manage these rising costs, enlisting the help of actuarial and benefits consultant Hewitt Associates to undertake a "retirement strategy project" in early 2003. Later that year, Abbott announced changes to its pension and retiree medical benefits that would increase the age at which newly hired employees would become eligible for retirement and would shift a portion of the burden of retiree health care costs to retirees.

---

[1] Plaintiffs' asserted their claim for breach of fiduciary duty against both Abbott and Hospira in Count IV of their amended complaint. By order of August 14, 2006, this court granted Hospira's motion to dismiss Count IV but denied Abbott's motion to dismiss the count. See Nauman v. Abbott Laboratories, 2006 WL 241372 (N.D. Ill. 2006).

At the same time Abbott was deciding upon changes to its benefits plans, it was evaluating opportunities, as it routinely did, to reshape the company through strategic acquisitions and divestitures that would maximize shareholder value. After analyzing a number of restructuring opportunities in or around early 2003, Abbott decided that year to seek the approval of Abbott's Board of Directors to spin off a portion of the HPD business into the new corporate entity that would become Hospira. As part of the transaction, approximately 10,000 of HPD's United States employees were transferred to the new company.

The spin-off was announced on August 22, 2003, and became effective on April 30, 2004. From the effective date of the spin-off through December 31, 2004, the new Hospira employees were entitled to benefits under a "transitional" benefit plan, which mirrored Abbott's plan. A few months later, Hospira announced the benefits package it would offer its employees beginning January 1, 2005. Among other changes, the pension plan Hospira had acquired from Abbott would be frozen when Hospira's plan became effective, and retiree medical benefits would not be offered under the new plan.

As part of the spin-off, Abbott and Hospira signed an agreement entitled Employee Benefits Agreement that, among other provisions, restricted the movement of employees between the two companies. In particular, the parties agreed to implement reciprocal no-hire policies, under which Hospira and Abbott each agreed not to hire, for a two year period following the spin-off, anyone whose employment at Abbott had terminated on or after the date the spin-off was announced. A few days prior to the expiry of that two-year period, Abbott amended its pension plan such that any employee who was subsequently rehired by Abbott would be considered a "new hire" for benefits purposes.

3

The first essential difference in the parties' respective views of these events is whether Abbott's decision to divest itself of its "core" HPD business was part of its broader strategy to manage rising benefits costs (as plaintiffs contend), or whether the decision to spin off HPD was entirely independent of any consideration of benefits costs to Abbott (as defendants insist). Under plaintiffs' theory of the case, the HPD spin-off was the *coup de grâce* in Abbott's attempt to stave off a looming and serious pension funding crisis. Under defendants' theory, any concerns Abbott may have had about rising costs were manageable in light of the company's generally healthy financial position, and they were adequately addressed by the benefits changes announced in 2003, and the decision to spin off HPD was made without any consideration of Abbott's benefits costs. The first major dispute, then, is over Abbott's intent in deciding to spin off HPD.

The second major dispute focuses on the respective roles of Abbott and Hospira in decisions affecting plaintiffs' benefits under the Hospira benefits plan. Plaintiffs contend that long before the Hospira plan was formally established, its terms were predetermined by Abbott. Defendants disagree.

Finally, the parties dispute the relationship between the reciprocal no-hire agreement and provisions contained in Abbott's pension plan that prevent rehires from Hospira from "bridging" past service at Abbott with any service that began after the expiration of the no-hire period. Plaintiffs contend that these measures were conceived hand-in-hand with each other and with the decision to spin off "core HPD"[2] with the intent of depriving them of their benefits. Defendants

---

[2]Defined by Abbott as "drug delivery systems and injectable pharmaceuticals."

4

argue that the no-hire agreement was a legitimate measure, now expired, whose purpose was to maintain workforce stability at each company.

## MATERIAL FACTS

### Abbott Amends its Benefits Plans

Between 1999 and 2001, Abbott's pension plan went from being over-funded by $849 million to being underfunded by $349 million. At a meeting of Abbott's Board of Directors in December of 2002, CFO Thomas Freyman presented an analysis entitled "Pension Update" that explained certain factors underlying the change in pension funding status. The presentation showed that for Abbott to meet its accumulated benefit obligations to plan participants, it would, for the first time, have to take a direct charge to equity for year-end financial reporting. The estimated charge would amount to approximately $200-$300 million. The "Pension Update" concluded with projections that "cash flow to fund pension obligations and accounting expense related to these plans will likely increase significantly over the "Long Range Plan" ("LRP")[3]," and that "if financial market returns stabilize/normalize, the situation is manageable, given Abbott's strong cash flow."

Following the December board meeting, Abbott investigated ways to slow the rise in benefit costs. Abbott hired Hewitt Associates in January 2003, to undertake a "retirement strategy project." The purpose of the project, as memorialized in a January 24, 2003, memorandum from Hewitt to Abbott, was to "deliver to Miles White a proposed retirement strategy, with an array of alternative approaches and their associated impact on the business, on costs, and on employees." The memorandum identifies Grice Williams, Lois Lourie, Bill Preece,

---

[3]Presumably, "Long Range Plan."

John Tebbetts, Ben Kwakye, and Tara Manno as the Abbott work team, and Tom Wascoe, Tom Freyman, Steve Fussell, Greg Linder, Terry Kearney, and John Berry as the Abbott board of review. The Hewitt team comprised Mary Moreland, Steve Wagner, and Judy Whinfrey.

In the summer of 2003, Abbott announced changes to its benefits plans effective January 1, 2004. The changes included reducing its basic pension plan formula for future service, increasing co-payments by retirees for medical care and increasing the age at which newly hired employees would be eligible for early retirement. When Abbott announced the forthcoming changes to its employees later that year, a portion of one of the goals CEO Miles White cited in his message to employees was to "reduce the company's cost increases to sustain our overall competitiveness."[4]

Abbott again amended its pension plan after the spin-off. Pursuant to an amendment adopted April 27, 2006, any employee transferred to Hospira who later returned to Abbott would be treated as a new hire for the purposes of Abbott's pension plan, and would not be eligible to "bridge" past service with future service for the purpose of accruing benefits.

The Demographics of HPD

Plaintiffs contend that HPD was a division that had a significantly more "senior" workforce than average, in terms of both employee age and years of service.[5] Plaintiffs base

---

[4]The stated goals were summarized as: "Continue to offer a superior benefits package; Support our heritage of long service and provide incentives for employees to work a full career at Abbott; Reduce the company's cost increases to sustain our overall competitiveness, while maintaining affordability for employees; and Improve the performance of our benefits vendors, along with the programs, tools and services available to our employees."

[5]Plaintiffs' theory has evolved over the course of discovery. Plaintiffs' original contention was that HPD was selected among a handful of proposed spin-off candidates because
(continued...)

6

their assertion on calculations and comments made at different times by Abbott and its consultants. First, in August of 2003, Gail Denham, Abbott's Vice President of Human Resources and a future Hospira executive, performed a demographic analysis of HPD employees in August of 2003 that included, among other elements, "profiling [she] did around retirement eligibility." Denham estimated that retirement-eligible employees comprised 15-16% of HPD's workforce,[6] and that the number of employees who were nearing eligibility for early retirement benefits comprised an additional 10-13% of HPD's workforce. Denham did not compare these statistics against other relevant Abbott populations. The parties agree, however, that HPD's demographics in terms of retirement eligibility are essentially the same as between HPD and the other businesses Abbott was considering for divestiture at that time. Denham concluded that her analysis "put some numbers around what we anecdotally know."

In September 2003, Hewitt estimated that approximately 18% of the HPD employees were eligible for retirement. According to calculations Hewitt reported to Denham in January of 2004, HPD employees were reported to have an average age of 42, while the "rest" of Abbott had an average age of 40.1, and that HPD employees had, on average, 11.2 years of service, while employees of the rest of Abbott had 8.6. Hewitt concluded that, "this is a significant population that will be sensitive to a retirement change." Abbott disputes the accuracy (and also

---

[5](...continued)
it was the most senior of the group. Presumably in light of discovery that revealed similar demographics among all of the divisions considered for spin-off, plaintiffs now compare all of the possible spin-off candidates against Abbott as a whole and argue that Abbott considered those divisions based on their older-than-average workforce.

[6]The court notes that the cited chart states that some, but not all, HPD segments were included in these calculations. Neither party has explained the significance, if any, of the selection of segments considered.

the relevance) of these figures, however, and has submitted the affidavit and supporting exhibits of a Hewitt consultant involved in making the calculations as evidence of their "rough" nature (the "Yurwitz Affidavit"). Abbott has also submitted a second affidavit with demographics it asserts are accurate (the "Steele Affidavit"). According to the Steele Affidavit and its supporting exhibit, the average age/service of HPD employees as of December 2003 was 42.5/9.77, while the averages for two other divisions considered for spin-off were 41.82/9.7 and 41.98/10.49. Plaintiffs do not substantively contradict the facts set forth in the Yurwitz or Steele Affidavits.

## The Spin-Off of "Core" HPD

In January of 2003, Abbott hired Morgan Stanley to assist in analyzing three potential divestitures (not including HPD) and one potential acquisition. A few months later, at the request of Abbott's management, Morgan Stanley also analyzed the possible divestiture of HPD. Morgan Stanley evaluated the impact of each potential reorganization with reference to a number of defined business criteria, which did not include the cost to Abbott of employee benefits.

The Abbott executives primarily responsible for analyzing restructuring opportunities were Miles White and Tom Freyman. They considered Morgan Stanley's materials in the context of Abbott's strategic goals. They also considered Abbott's "investment identity," the company's strategic makeup, and how each business unit fit within the company's investment identity. Mr. White prepared a chart summarizing the key considerations for evaluating strategic opportunities, which he presented to Abbott's Board of Directors at a meeting on June 19, 2003 as part of a "strategy review." The presentation discussed the pros and cons of each potential restructuring and concluded with the recommendation that Abbott spin off "core" HPD, while retaining "high acuity" HPD. Employee benefits were not discussed in the strategy review

8

presentation. The board gave its approval to begin the initial phases of the HPD spin-off, with the understanding that final approval would be sought at a later date based upon further analysis.

By the time Abbott made its recommendation to the board to spin off "core" HPD, it had also begun to consult with Hewitt on the financial implications of the proposed transaction, including on Abbott's benefits obligations. On June 9, 2003, Hewitt provided Abbott's William Preece and Steve Fussell with projections relating to the HPD spin-off, which calculated the financial impact of the spin-off on Abbott, based on certain assumptions. Among other figures, the document references a one-time credit to Abbott of $77.8 million and an annual reduction of $67 million in benefits costs. Abbott contends that these gains are insignificant in light of the costs Abbott incurred as a result of the spin-off, but does not dispute that Abbott realized the projected gains.

Over the next several months, Hewitt continued to advise Abbott with respect to potential financial consequences of the transaction. Hewitt analyzed alternative approaches for handling the HPD employees pension plans and discussed their potential impact on various aspects of Abbott's business, including its benefits-related costs. Whether Abbott would retain the assets and liabilities associated with HPD employees or transfer them to Hospira was one of the factors Hewitt and Abbott considered. An analysis that Hewitt provided Gail Denham in August 2003 compares the benefits payable to HPD employees under different sets of assumptions. In every scenario, Hewitt assumed that Hospira would freeze benefit accruals as of December 31, 2004. Hewitt compared the value of monthly benefits to employees: (1) if Abbott spun off assets and liabilities, (2) if Abbott retained the assets and liabilities, and (3) if the employee had remained at Abbott. In each of the 6 "strawman" scenarios, the projected

9

pension benefit to the employee is lowest in the "if Abbott retains assets/liabilities" and greatest in the column "if remain at Abbott."[7]   Ultimately, Hewitt advised, and Abbott decided, to transfer accrued pension liabilities for the transferring employees, plus a $45 million "top off" that would leave the funded ratio for the Hospira pension assets equal to the funded ratio for the pension assets that Abbott retained.

Hewitt also studied the potential impact of an *en masse* retirement at the time of the spin-off of all retirement-eligible HPD employees.  Hewitt's Mary Moreland cautioned that if all retirement-eligible employees opted for retirement, Abbott would face increased one-time and annual OPEB[8] expenses and that the impact on pension expenses would also be "significant." Steve Fussell observed that Abbott could realize savings by transferring a portion of the burden for providing retiree medical benefits to the new company.

On August 21, 2003, Abbott's Board of Directors approved the public announcement of the HPD spin-off, which was made the following day.  Hospira's CEO, Chris Begley, testified during this litigation that between August 22, 2003, and the date the spin-off became effective in April 2004, "there were points where it was in question whether or not it would make sense to spin off what was then called NewCo and ultimately the decision was made that it did make sense to move forward."

Shortly before the spin-off became effective, Abbott and the new Hospira entered into an agreement – the Employee Benefits Agreement – that included the mutual no-hire provisions.

---

[7]Where a 53 year old employee is assumed, the figures are equal in all scenarios as of the "commencement" date, but as the employee ages, the benefits are again lowest in the "if Abbott retains assets/liabilities" and greatest in the "if remain at Abbott" scenario.

[8]Presumably, "other postemployment benefits."

Hospira promised not to hire any HPD employees whose employment with Abbott terminated anytime between the announcement of the spin-off on August 22, 2003, and the end of the two-year period beginning on the effective spin-off date.[9]  One effect of this provision was that anyone who elected to retire from Abbott after the spin-off was announced would be ineligible for employment at Hospira.  Abbott, for its part, agreed not to hire any employees transferred to Hospira in the spin-off for a period of two years from the effective date.  The two year no-hire provision expired on May 1, 2006.

In late 2003 and early 2004, Abbott asked Hewitt to calculate the present value of the retiree medical and pension benefits for two senior Abbott executives who were slated to transition to Hospira.  Emails among Abbott executives reflected that Abbott's CEO had made a commitment to those executives to "keep them whole" and wanted to know "what we can do for them about: retiree health, retirement, trusts/SRP... ."  Abbott made confidential "accommodation[s]" with these and several other "key" Abbott executives, which included lump sum payments associated with their transition to Hospira.

After the spin-off, Abbott and Hospira became independent companies, and Abbott did not have any shared ownership in Hospira, shared no board members with Hospira, and did not appoint any Hospira board members.

The Transition to Hospira's Benefits Plans

A number of communications between Abbott and future Hospira executives discuss the expectation that Hospira would reduce its "benefits burden" after the spin-off.  Plaintiffs cite, for example, to the "HR Guiding Principles" circulated by Steve Fussell to other Abbott executives,

---

[9]The limited exceptions to this provision are not relevant here.

11

which states that because the future Hospira would bear its own benefits and other HR costs, Hospira had an incentive to "accelerate their migration to a lower-cost HR structure post-spin."

After the spin-off was announced, Abbott gave its employees conflicting messages about whether or not they would be entitled to retire from Abbott and begin working at Hospira. During a question-and-answer session with employees held on the day the spin-off was announced, Chris Begley, Hospira's future CEO, said that employees would be able to retire from Abbott and collect retiree benefits while working for Hospira. By the time the spin-off became effective, however, Abbott had signed the Employee Benefits Agreement, which, as noted above, precluded Abbott retirees from working at Hospira.

During the period immediately following the spin-off, and through December 31, 2004, the new Hospira employees continued to accrue benefits under the "transitional plan" that mirrored Abbott's pension plan. Two months after the spin-off became effective, Hospira's board of directors approved Hospira's benefit plan, which was to become effective at the expiry of the transitional plan. Among other changes, the Hospira plan froze the Annuity Retirement Plan ("ARP") and eliminated retiree medical benefits. Hospira realized an immediate accounting gain as a result of the write-off the expenses associated with the reduction in benefits.

## DISCUSSION

Legal Standard

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(e). It is not the court's function, at the summary judgment stage, to

12

weigh the evidence and decide on the merits but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The court views the evidence in the light most favorable to the nonmovant. Benders v. Bellows and Bellows, 515 F.3d 757, 762 (7th Cir. 2008). Nevertheless, the nonmovant must come forth with specific facts sufficient to enable a reasonable trier of fact to find in its favor, and merely "a scintilla of evidence" is not enough to avoid summary judgment. Anderson, at 252.

ERISA § 510 (29 U.S.C. § 1140) provides that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

Employees' loss of benefits as a result of their employer's action does not, by itself, amount to a violation of § 510. Isbell v. Allstate Insurance Co., 418 F.3d 788 (7th Cir. 2005). To succeed on a § 510 claim, a plaintiff must show that her employer acted with the specific intent to deprive her of plan rights. Lindemann v. Mobil Oil Corp., 141 F.3d 290, 295 (7th Cir. 1998). In other words, where the deprivation of ERISA-protected rights is merely an incidental consequence of the employer's action, there is no § 510 claim. Isbell, at 796; Meredith v. Navistar Int'l Transp. Corp., 935 F.2d 124, 127 (7th Cir. 1991). But if the materials properly before the court, construed sympathetically, support the conclusion that the "desire to frustrate attainment or enjoyment of benefit rights contributed toward the employer's decision," Teumer v. General Motors Corp., 34 F.3d 542, 550 (7th Cir. 1994), summary judgement must be denied.

A fundamental prerequisite to a § 510 action is an allegation that the employment relationship–as opposed to merely the pension plan–was changed in some wrongful way. See

13

Deeming v. American Standard, Inc., 905 F.2d 1124, 1127 (7th Cir. 1990). In Deeming, the Seventh Circuit recognized a § 510 violation based on the collective termination of employees of a plant slated for closure. The court observed that "§ 510 was designed to protect the employment relationship which *gives rise* to an individual's pension rights" (emphasis in original). The Seventh Circuit has also held that the statute's legislative history "reveals that the prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." McGath v. Auto-Body North Shore, Inc., 7 F.3d 665 (7th Cir. 1993).

As in other types of employment cases, a plaintiff asserting a § 510 claim can show a violation using either the direct or the indirect method of proof. While a plaintiff may rely on circumstantial evidence when using the direct approach, that evidence must "construct a convincing mosaic" that "points directly to [the prohibited] reason for the employer's action." Isbell, at 794. Under the direct approach, the court must conclude that the factual record contains sufficient direct or circumstantial evidence for a reasonable trier of fact to find that Abbott spun off core HPD, and that Abbott and Hospira adopted mutual no-hire restrictions with the "specific intent of interfering" with HPD employees' attainment of ERISA-protected benefits. Teumer v. General Motors Corp., 34 F.3d 542, 550 (7th Cir. 1994).

Alternatively, a plaintiff may prove a § 510 violation indirectly by using the McDonnell Douglass burden-shifting analysis. Under this approach, a plaintiff may make out a prima facie claim by establishing that he suffered an adverse employment action "under circumstances that provide some basis for believing that the prohibited intent...to prevent the use of benefits was present." Isbell, at 796. The burden then shifts to the defendant to articulate a legitimate,

14

nondiscriminatory reason for the action. Meredith v. Navistar Int'l Transp. Co., 935 F.2d 124, 127 (7th Cir. 1991). Once the defendant has advanced a legitimate, nondiscriminatory reason for the disputed action, the court need no longer determine whether the plaintiff has stated a prima facie case. Lindemann v. Mobil Oil Corp., 141 F.3d 290, 296 (7th Cir. 1998) ("'where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.'" Id., quoting United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)). If the defendant meets its burden of establishing a legitimate business reason for the disputed action, the burden shifts back to the plaintiff to demonstrate that the proferred explanation is a pretext, and that the desire to interfere with the plaintiff's attainment of benefits was a "determinative factor" behind the action. Lindemann, at 296. To demonstrate a material issue as to pretext, a plaintiff need not disprove the existence of legitimate objectives. To survive summary judgment, plaintiffs must show either that the prohibited intent is more likely to have motivated defendants than the legitimate objectives, or that the defendants' asserted objectives are not credible. See Hudson v. Chicago Transit Authority, 375 F.3d 552, 561 (7th Cir. 2004). The court does not "sit as a super-personnel department that reexamines an entity's business decisions" but looks to whether the employer gave an honest explanation for its actions. Id.

Regardless of whether the plaintiff proceeds under the direct or indirect method of proof, the plaintiff ultimately bears the burden of showing that the employer would not have taken the adverse employment action "but for" the impermissible factor. Cerutti v. BASF Corp., 349 F.3d 1055 (7th Cir. 2003).

15

Section 404 of ERISA sets forth the duties applicable to plan fiduciaries. See 29 U.S.C. § 1104(a). The term "fiduciary" is liberally construed in light of the remedial nature of ERISA. Ames v. American Nat. Can Co., 1997 WL 733893 (N.D. Ill. 1997). Under ERISA, a person is a fiduciary "to the extent [] he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(a).

## Plaintiffs' ERISA § 510 claims

In Counts I through III, plaintiffs assert that Abbott's termination of their employment, and defendants' adoption of no-hire policies, were undertaken with the specific intent of depriving plaintiffs of their ERISA-protected benefits. Defendants dissect these claims count by count, and, examining each in isolation, argue that plaintiffs' evidence is insufficient to raise a genuine issue of fact as to whether the prohibited intent motivated any one of the individual acts alleged. Thus framed, defendants' arguments are generally persuasive. For example, Abbott argues convincingly that the transaction fails to meet the requirements set forth in Andes v. Ford Motor Co., 70 F. 3d 1332, 1338 (D.C. Cir. 1995). Under that standard, acknowledged by the Seventh Circuit in Deich-Keibler v. Bank One, 2007 WL 1827260, at *5 (7th Cir. 2007), a plaintiff can prove a § 510 violation based on the closure or sale of a corporate division only by demonstrating that "some ERISA-related characteristic special to the unit...was essential to the firm's selecting the unit for closure or sale." Abbott argues persuasively that because plaintiffs' evidence fails to demonstrate that  HPD had "special ERISA characteristics," it falls short of at

least the first prong of the Andes test.[10]  Abbott further argues that because plaintiffs cannot demonstrate that the asserted business justification for Abbott's decision to spin off HPD was "a lie," they fail to raise a triable issue as to Abbott's intent on that point.

These arguments, however, are premised on the assumption that the several counts of plaintiffs' complaint arise out of independent and unrelated events: Abbott's decision to spin off HPD; Abbott and Hospira's implementation of that decision, including the execution of the Employee Benefits Agreement and the allocation of resources between the companies; Hospira's definition and announcement of its benefits plans; and Abbott's subsequent amendment eliminating "bridging rights" for HPD employees who return to Abbott.[11]  But as the court has

---

[10]As mentioned earlier, plaintiffs' position with respect to HPD's "special" characteristics has evolved over the course of this litigation, and they have apparently abandoned their original position that HPD was significantly more senior than the other divisions that Abbott considered spinning.  Plaintiffs now argue that Abbott's intent to deprive plaintiffs of their benefits is supported by evidence that Abbott considered only its comparatively older business units for divestiture.  This argument is not without appeal.  It is conceivable that a trier of fact applying the Andes standard could reasonably determine liability against an employer who uses ERISA characteristics as a kind of litmus test for selecting which business divisions to consider for sale or closure, even if only one such division is ultimately sold or closed.  Plaintiffs' evidence here, however, does not support such a finding.  According to the statistics in the unrefuted Steele Affidavit and exhibits, the three "senior" business units considered for divestiture were only marginally senior to Abbott's average taken as a whole.  Moreover, according to plaintiffs' own allegations, the fourth business unit Abbott considered for divestiture had a "much younger employee base."  In any event, however, plaintiffs' failure to meet the Andes requirements is not dispositive of Abbott's motion as to Count I for the reasons discussed below.

[11]Plaintiffs' complaint does not contain allegations relating to the amendment to Abbott's pension plan, as, indeed, the plan was amended in 2006 and Abbott failed–either deliberately or inadvertently–to produce the amendment when requested during discovery.  There is no question that plaintiffs alleged in their amended complaint that the loss of "bridging rights" was part of Abbott's no-hire policy.  That the mechanism for preventing plaintiffs from exercising those rights was not formally adopted until April 2006 (before which there was no need for it, of course, due to the two-year hiring ban) does not preclude a finding that the elimination of bridging rights was, in fact, part of the no-hire policy.  In the court's view, Abbott's adoption of
(continued...)

17

previously recognized, plaintiffs' position is that the termination alleged in Count I, coupled with the policies challenged in Counts II and III, constitute a "scheme" that Abbott conceived, and that the defendants jointly adopted, with the specific intent of avoiding the payment of projected benefits. See Nauman v. Abbott Labs., 2005 WL 1139480, at *1 (N.D. Ill 2005) ("Nauman I").

Understood in this way, the court sees no reason to analyze plaintiffs' "termination" as merely their separation from Abbott, without reference to the series of decisions by Abbott and Hospira that modified plaintiffs' employment status both as of the time of the transfer and from that point onward. Indeed, while a "discharge" (or any other of the enumerated adverse actions) is a prerequisite to stating a cause of action under § 510, the court finds nothing in either the statute or the interpretative case law to suggest that an employer's "purpose" in discharging an employee must be ascertained by exclusive reference to the factors underlying the decision to terminate, without regard for accompanying or subsequent decisions by the employer that established the contours of the employee's change in "employment status." Where the terms of an employee's separation affect her entitlement to benefits, it is reasonable to consider not only the employer's decision to terminate, but also the factors the employer considered when deciding upon those terms.

This lesson can be drawn from Deeming v. American Standard, Inc., 905 F.2d 1124, 1127 (7th Cir. 1990). In that case, all of the workers at a particular plant lost their jobs when the employer decided to close the plant. At the time the plant closure was announced, a long-

---

[11](...continued)
the "bridging rights" amendment supports, rather than undermines, plaintiffs' allegations. Therefore, plaintiffs suffer no prejudice from the court's consideration of the amendment, and their motion to strike is denied.

standing collective bargaining agreement provided that in the event of a plant closure, employees could elect either to receive severance pay or to be placed on layoff. Layoff status entitled the employees to additional pension benefits. As the plant closure drew near, however, the employer unilaterally revised the terms of the collective bargaining agreement–which was contemporaneously up for renewal–to eliminate the plant workers' option to elect layoff status. Instead, the employer terminated all of the plant employees, depriving them of the benefits to which they would have been entitled had they been able to elect layoff status.

Notably, the Deeming court specifically declined to find a violation of § 510 on the basis of the plant closure, based on evidence that the closure itself was based on increasing foreign competition and decreasing demand for the products the plant manufactured. Id., at 1127. The court further observed that employers are generally entitled to eliminate or amend their pension plans, despite the obvious effect of terminating some benefits of the affected employees. Id., at 1127-28. Thus, neither the decision to close the plant nor the employer's modification of its benefits was independently sufficient to give rise to a § 510 claim. Nevertheless, the court held that the employer's unilateral termination of employees who had been promised the ability to determine their own employment status (i.e., to select layoff instead of termination) in the event of a plant shutdown "amounts to discrimination against the 'employment relationship' that § 510 was designed to protect." Id., at 1129.

Deeming thus teaches that it is not only the factors that led to an employer's decision to terminate employees, but also the terms upon which the employer effects the termination that provide a window into the employer's motivations. Had the court analyzed the plant closure separately from the employer's amendment to the pension plan–as defendants generally suggest

19

the court should do here–it would have come to the opposite conclusion. But the Deeming court did not parse the plaintiffs' claims so narrowly. Instead, the court examined the totality of the employer's conduct and determined that the intent to interfere with the plaintiffs' benefits could reasonably be inferred.

Here, the court similarly finds that defendants' intent can best be ascertained by considering their conduct as a whole. Accordingly, evidence that Abbott compared the financial implications of continuing to provide plaintiffs' benefits under the Abbott plans with the implications of eliminating or reducing those benefits–even if conducted after preliminary approval by the Abbott board–is relevant to the ultimate issue of whether defendants had the specific intent of interfering with the plaintiffs' attainment of benefits.

Just as Abbott's asserted business reasons for the spin-off fail to eliminate Count I, defendants' asserted justifications for the reciprocal no-hire agreement fall short of demonstrating an absence of triable issues as to Counts II and III. Defendants do not dispute that the no-hire policies were conceived and adopted as part of the spin-off, or that just prior to the expiration of those policies Abbott amended its pension plan to eliminate "bridging rights" for any Hospira employee who later chose to return to Abbott. Defendants are certainly entitled to present evidence that no-hire agreements are considered a "best practice" in corporate reorganizations. That this may be so, however, does not preclude a factual finding that the specific terms of the no-hire policies at issue, taken in context, reveal defendants' specific intent to interfere with plaintiffs' attainment of benefits.

Moreover, plaintiffs need not prove that defendants were motivated by the prohibited intent to the exclusion of all legitimate purposes. In this sense, defendants overstate plaintiffs'

burden when they argue, as Hospira does, that plaintiffs must show defendants' asserted reasons are "a pretext that Hospira (and Abbott) (and Hewitt) concocted to conceal some ulterior motive to interfere with plaintiffs' ERISA rights." The Seventh Circuit has held that a plaintiff asserting a § 510 claim must prove only that the intent to interfere with benefits "contributed toward" her employer's adverse action, or, alternatively stated, was a "motivating" or a "determinative" factor in the action. See, Isbell, at 796 (plaintiff must show desire to frustrate attainment of rights "contributed toward" decision); Salus, at 136 (intent to interfere with benefits must be "a motivating factor"); Meredith, at 127 ("a determinative factor"). Accordingly, plaintiffs need not show defendants' asserted reasons were "a lie"; they must show only that the prohibited intent was also a critical factor in the decision.[12]

Taken together, plaintiffs' allegations and evidence are sufficient to raise a genuine issue of material fact as to defendants' intent in carrying out the series of transactions and agreements that effected a change in plaintiffs' employment status and forever preclude them

---

[12]The court is mindful that while the language of Isbell, Salus, and Meredith suggests that liability may be found for actions motivated by both lawful and unlawful motives, the Seventh Circuit has yet to find § 510 liability in such a "mixed-motives" case. Indeed, in Salus, the only case in which the Seventh Circuit has upheld a § 510 violation based on the finding that the intent to interfere with benefits was "a" (rather than "the") motivating factor, the court also found that the employer's asserted justification was pretextual. See id., at 136. In the two other Seventh Circuit cases to hold that an improper motive need only "contribute toward" or be "a determinative factor in" an adverse decision, the court nonetheless found no § 510 violation. See Isbell; Meredith. Nevertheless, the court sees no justification here for foreclosing the reasonable possibility that § 510 liability could be based on a mixed motive that these cases left open.

from exercising the "bridging rights" to which other Abbott employees would be entitled if they opted to leave Abbott and later returned.[13]

For these reasons, Abbott's motion for summary judgment as to Counts I and II and Hospira's motion for summary judgment as to Count III are denied.

Plaintiffs' ERISA §§ 404 claim

In Count IV, plaintiffs claim that Abbott breached its fiduciary duty by falsely leading HPD employees to believe that after a defined "transition" period, Hospira (and not Abbott) would be responsible for structuring a benefits plan that was good for the new company and its employees. Plaintiffs allege that in truth, Abbott was responsible for structuring the future Hospira plan, that final decisions about the plan, which included the reduction or elimination of certain of plaintiffs' benefits, were made before the spin-off was effective, and that Abbott concealed these decisions in breach of its fiduciary duty to plaintiffs.

Abbott's argument is two-fold. First, Abbott contends that it had no fiduciary duty at all with respect to Hospira's benefit plans. Abbott claims that by the time the Hospira plan was established, Hospira was a separate and independent entity, and that the Hospira plan was not yet in existence when Abbott made its alleged misrepresentations about the plan. Abbott concludes that it therefore had no duty to the HPD employees with respect to the Hospira plan. Abbott's second argument is that because plaintiffs cannot show that they were misled or that they detrimentally relied on Abbott's alleged misrepresentations, their claim fails in any event.

_____

[13]Defendants' argument that Counts II and III are moot is without merit. This argument merely reflects defendants' erroneous construction of plaintiffs' claims regarding the "no-hire policies" as a challenge merely to the two-year hiring restriction. In fact, plaintiffs specifically incorporate into their description of the alleged no-hiring policy Abbott's denial of bridging rights to potential rehires who return to Abbott from Hospira.

Neither of Abbott's arguments entitles it to summary judgment. First and foremost, there is sufficient evidence to demonstrate a genuine dispute as to whether Hospira was, in fact, a "separate and independent entity" at the time decisions about its plan were made. The tension between Abbott's position here and its arguments relating to Counts II and III is apparent. In the context of the plaintiffs' "no-hire" claims, Abbott argues forcefully that plaintiffs could not have retired from Abbott and gone to work at Hospira because the employees were "keeping the same jobs, working at the same desks, with all the same responsibilities, for a piece of the same company that would administer the same transferred pension assets." Indeed, Abbott's parenthetical characterization of the case it cites for this proposition, <u>Rowe v. Allied Chemical, Hourly Employees' Pension Plan</u>, 915 F.2d 266, 267-68 (6th Cir. 1990), is: "(holding that employees of sold-off facility were not eligible to 'retire,' start collecting their pension, and then <u>continue working for same company under different ownership</u>)." (Emphasis added). Moreover, regardless of whether Hospira was a separate and independent company when it established its benefits plans, plaintiffs have offered evidence to suggest that Abbott structured the spin-off in a way that made the reduction or elimination of plaintiffs' benefits inevitable, because the transaction left the new company without the financial wherewithal to maintain benefits comparable to Abbott's.

A company may be considered a fiduciary of an ERISA plan if it exercises "a degree of discretion over the management of the plan or its assets, or over the administration of the plan itself." <u>Kamler v. H/N Telecommunication Services</u>, 305 F.3d 672, 681 (7th Cir. 2002). Abbott's reliance on <u>Ames v. American National Can Co.</u>, 1997 WL 733893 (N.D. Ill. 1997), in support of its argument that it has no fiduciary duty with respect to the plan of its successor is

unavailing. Although the Ames court held, as Abbott highlights, that fiduciary liability was not appropriate based on the employer's failure to inform its employees of the terms of a successor's benefits, the basis for that holding was the finding that the employer "had no discretionary authority or control of the plans." Ames, at *15. As noted, plaintiffs have raised a genuine issue as to whether Abbott did, in fact, exercise control over the Hospira plan or its assets. Accordingly, the fact that the Hospira plan came into existence only after Hospira became a separate company is immaterial.

Abbott's argument that it could not have misled plaintiffs because it informed them that their benefits "might" change at the new company (rather than that they "would" change) is meritless. As the court has already noted, "plaintiffs have alleged that Abbott stated that certain decisions had not yet been made, when in fact they had. That is a misrepresentation as to a present fact, and it is clearly actionable." See Nauman v. Abbott Laboratories, 2006 WL 2413712, at *3 (N.D. Ill 2006). Abbott's position is not helped by evidence that at the time Abbott's management was structuring the spin-off transaction, confidential, lump-sum "transition bonuses" were offered to several "key" Abbott executives to compensate them for lost benefits arising out of their transfer to Hospira. The trier of fact could conclude from this evidence that Abbott knew Hospira would reduce or eliminate benefits but deliberately concealed this information from plaintiffs.

Abbott argues that because plaintiffs' evidence demonstrates that they did not detrimentally rely on Abbott's alleged misrepresentations (pointing in particular to the fact that all of the named plaintiffs continue to be employed by Hospira to this day), their claim cannot succeed. As this court has previously noted, however, the Seventh Circuit has never expressly

24

held that detrimental reliance is an element of an ERISA breach of fiduciary duty claim. The elements of the claim are: (1) defendants are plan fiduciaries; (2) defendants breached their fiduciary duty; and (3) the breach caused harm to the plaintiff. See Nauman v. Abbott Laboratories, 2007 WL 1052478, at *2 (N.D. Ill. 2007) (citing Kamler v. H/N Telecommunication Services, 305 F.3d 672, 681 (7th Cir. 2002). As discussed above, plaintiffs have raised a genuine issue of fact as to the first two factors.

Finally, Abbott claims that plaintiffs' evidence is insufficient to raise a genuine issue as to harm. In particular, Abbott argues that the evidence shows, at best, that plaintiffs declined look for another job, and that forbearance from seeking alternative employment is insufficient to show harm as a matter of law. Plaintiffs respond by pointing to evidence that in addition to investigating other job opportunities, they would have taken steps vis-a-vis Abbott to seek compensation for the benefits they were about to lose had they known that Hospira's benefits package would be less robust than Abbott's. As noted above, certain Abbott executives apparently obtained just such compensation in the form of "transition bonuses." Plaintiffs' evidence is sufficient to raise a triable issue as to whether they were harmed by Abbott's alleged misrepresentation.

For these reasons, Abbott's motion for summary judgment as to Count IV is denied.

## CONCLUSION

Based on the foregoing analysis, Abbott's motion for summary judgment as to Counts I, II and IV and Hospira's motion for summary judgment as to Count III are denied.

ENTER:     July 10, 2008

Robert W. Gettleman
United States District Judge